The **CHANNING CLUB** et al., Plaintiffs,

v.

The **BOARD OF REGENTS OF TEXAS TECH UNIVERSITY** et al., Defendants.

**Civ. A. No. 5–737.**

United States District Court,
N. D. Texas,
Lubbock Division.
Sept. 17, 1970.

Thomas J. Griffith, Lubbock, Tex., for plaintiffs.

William R. Shaver, Resident Counsel, Lubbock, Tex., Crawford Martin, Atty. Gen. of Tex., Nola White, First Asst. Atty. Gen. of Tex., A. W. Walker, Executive Asst. Atty. Gen. of Tex., W. O. Shultz, Asst. to Atty. Gen. of Tex., Austin, Tex., James H. Milam and Cecil Kuhne, Crenshaw, Dupree & Milam, Lubbock, Tex., for defendants.

## MEMORANDUM OPINION

WOODWARD, District Judge.

This is a civil action seeking injunctive and declaratory relief.

Plaintiffs are persons who are interested in or associated with The Channing Club, an unincorporated association recognized on the campus of Texas Tech University. The Channing Club sponsors a publication known as The Catalyst, a tabloid newspaper irregularly

published and addressed primarily to the students and faculty of the university. The paper contains articles and opinions deemed by its publishers to be of current interest to its readership. Though technically a non-profit enterprise, The Catalyst is obliged to levy a charge for copies and advertising.

The Defendant, the Board of Regents of Texas Tech University, is the governing body of the university and is created by the laws of the State of Texas; other defendants include the President and Executive Vice-President of the university, the Vice-President for Student Affairs, and the Chairman of the Campus Solicitations Committee.

On January 13, 1970, Defendants prohibited the circulation and distribution of Issue 6, Volume I of The Catalyst on the campus of Texas Tech University. This action was taken under the Code of Student Affairs and Rules and Regulations 1969–1970, the pertinent portions of which provide that misconduct which may lead to disciplinary action includes "lewd, indecent or obscene conduct or expression on University-owned-or-controlled property" and "selling and soliciting on the campus without official authorization." Moreover, Defendants' answer indicates that the publication was prohibited because Defendants felt they had the "right to prohibit the sale and distribution of printed matter which does not have any literary value and which uses lewd, indecent and vulgar language." No other issues of the newspaper were banned. Rather than risk expulsion from the University or other disciplinary action, the suit was filed by Plaintiffs to bring relief.

Two areas on the campus—one in the Student Union Building, the other in the campus bookstore—had been designated for the sale and distribution of The Catalyst. Both these areas contained newstands or book stalls from which various other publications were sold or distributed. Plaintiffs offered into evidence a number of these publications, including such items as Confessions of a White Racist in the January, 1970 issue of HARPER'S MAGAZINE (Plaintiffs' Exhibit No. 8); Soul on Ice, by Eldridge Cleaver (Plaintiffs' Exhibit No. 17), which had been placed on a reading list for a sociology course offered by the university; the July 14, 1970 issue of the National Review (Plaintiffs' Exhibit No. 19); the recorded lyrics from the album of the Broadway musical Hair! (Plaintiffs' Exhibit No. 20); the October 11, 1969 issue of The New Republic (Plaintiffs' Exhibit No. 31). All these publications contained the same or similar language which Defendants found objectionable in The Catalyst. Defendants admitted that none of these publications had been prohibited from sale or distribution on the campus.

Additionally, Plaintiffs exhibited numerous publications taken from the library of Texas Tech University, many of which were either required or recommended reading in various university courses, and which contained essentially that language objected to in The Catalyst.

Plaintiffs allege that since the University authorized this uninterrupted sale of newspapers, magazines and books, and since many such publications were collected in the university library for dissemination to the general reading public, the action of Defendants subjected them to capricious and arbitrary treatment and accordingly denied Plaintiffs the equal protection of the laws.

Furthermore, the complaint attacks the rules in the Code of Student Affairs, previously quoted, as being unconstitutional because of vagueness or overbreadth, or alternatively, unconstitutionally applied to these Plaintiffs. Procedural sections of the Code are also attacked as denying Plaintiffs due process of law. Because of the view this Court takes with respect to the threshold question of discrimination and denial of equal protection, it becomes unnecessary to deal with those issues regarding the constitutional validity of the published rules and procedural due process.

■ Plaintiffs and the class they represent clearly have a constitutionally

guaranteed right of freedom of expression which is protected against state infringement, Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925), includes freedom of the press, Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), is protected on the campus of a state university, West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), but may be regulated by the university in the promotion or protection of a valid university interest, Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Blackwell v. Issaquena County Board of Education, 363 F.2d 749 (5th Cir.1966); Burnside v. Byars, 363 F.2d 744 (5th Cir.1966).

■ The extent to which expression may be restricted varies somewhat, depending on whether the limitation sought is to be placed on the expression itself (meaning content) or on conduct which is incidental to the expression (meaning time, place, manner and duration).

■ The standard devised for direct regulation of expression by a university, *Tinker, Blackwell,* and *Burnside, supra,* provides that the exercise of the expression sought to be limited must interfere to a substantial and material degree with the requirements of appropriate discipline in the operation of the school.

■ The standard devised for regulation of conduct which incidentally limits speech, Goldberg v. Regents of California, 248 Cal.App.2d 867, 57 Cal.Rptr. 463 (1967), provides that reasonable restrictions on first amendment rights are recognized in relation to public agencies that have a valid interest in maintaining good order and proper decorum. American Civil Liberties Union of Southern California v. Board of Education, 59 Cal.2d 203, 212, 28 Cal.Rptr. 700, 379 P.2d 4 (1963).

It is obvious that the prohibition of The Catalyst by Defendants from the Texas Tech campus is a direct limitation by the State on the content of the expression, rather than an incidental restriction of time, place and manner of distribution. Hence, the cases cited in Defendants' brief supporting the latter standard are inappropriate.

■ Such direct regulation of expression must therefore be founded upon substantial justification, some overriding governmental interest vindicating interference with first amendment freedoms. Here, no such justification has been shown to exist. Testimony revealed no indication that the work of the university or any class was disrupted; there were no hostile remarks, no threats or acts of violence, no infringement or restriction on the rights of other students, and no indication of that clear and present danger of a serious substantive evil necessary to justify invasion of constitutionally protected rights. It is not enough that administrative officials anticipated the possibility of some disturbance; uncrystalized apprehension of disruption cannot oversome the right to free expression. Tinker v. Des Moines Independent Community School District, *supra.* Indeed, while freedom of speech is not absolute, one of its essential functions is the invitation of dispute and the exchange of challenging and provocative ideas. Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 131 (1949). That the language is annoying or inconvenient is not the test. Agreement with the content or manner of expression is irrelevant; first amendment freedoms are not confined to views that are conventional, or thoughts indorsed by the majority. The Courts are neither judges of the social worth of ideas nor arbiters of taste. Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

■■ Absent circumstances showing Defendants possessed substantial justification to invade protected rights, an issue then arises as to whether Defendants in fact subjected Plaintiffs to an arbitrary and selective action, thereby denying them equal treatment in view of the content of other publications ex-

pressly permitted and even assigned to students as required reading. It is fundamental, of course, that constitutional freedoms are not forfeited by mere enrollment at a state supported university. See Tinker v. Des Moines Independent Community School District, *supra*, and the cases there cited. Literary merit and matters of taste to the contrary notwithstanding, and with which this Court is not concerned, it is clear from the facts elicited at trial that Defendants discriminated against the Plaintiffs in the prohibition of The Catalyst.

The assignment for study and examination of publications containing the language of The Catalyst would be permissible and that would not be grounds for the Plaintiffs here to claim discrimination or denial of equal protection of the laws. Close v. Lederle, 424 F.2d 988 (1st Cir.1970). But numerous other publications, not banned, and sold from the same location as The Catalyst, contained language identical to that objected to here which does sustain the allegation of discrimination and denial of equal protection. There thus being no legal distinction between the types of publications, the State does not become privileged to ban a publication merely because it is edited and published by students. This alone is sufficient to justify the issuance of the injunction. The Court refrains from consideration of those issues regarding the constitutional validity of the published university rules and procedural due process under those rules.

On the second and final day of trial, August 5, 1970, Defendants filed in open Court their Motion to Dismiss. The memorandum in support of this motion took the position that administrative officers acting in their official capacity were not "persons" within the meaning of 28 U.S.C. § 1343, and 42 U.S.C. § 1983, relying on Harkless v. Sweeny Independent School District, 300 F.Supp. 794 (S.D.Tex.1969) and Schwartz v. Galveston Independent School District, 309 F.Supp. 1034 (S.D.Tex.1969). The *Harkless* opinion was reversed in Harkless v. Sweeny Independent School District, 427 F.2d 319 (5th Cir.1970), holding that such officials were persons within the meaning of the Civil Rights Act. The *Schwartz* opinion was expressly overruled in 430 F.2d 430 (5th Cir. 1970), the latter case holding that exhaustion of state judicial and administrative remedies was unnecessary for Federal Court jurisdiction under the cited sections of the Civil Rights Act. The Motion to Dismiss is denied.

The requested injunction is hereby granted; Plaintiffs may sell and distribute Issue 6, Volume I of The Catalyst in the same manner and at the same times and places in which it was formerly distributed and sold.

This opinion shall constitute the Court's Findings of Fact and Conclusions of Law. It is so ordered.

Costs are adjudged against the Defendants.

The Clerk will furnish a copy to each attorney of record.