Lisa Martine PLISCOU, a minor, by Norm Pliscou, her guardian ad litem, Plaintiff,

v.

HOLTVILLE UNIFIED SCHOOL DISTRICT et al., Defendants.

Civ. No. 75–0926–GT.

United States District Court, S. D. California.

Feb. 13, 1976.

Tom Adler, Jones, Cazares, Adler & Lopez, Robert H. Lynn, American Civil Liberties Union, San Diego, Cal., for plaintiff.

James H. Harmon, County Counsel, Joseph C. Daly, Jr., James L. Darrow, Deputy County Counsels, County of Imperial, El Centro, Cal., for defendants.

## AMENDED MEMORANDUM OPINION

GORDON THOMPSON, Jr., District Judge.

The plaintiff, Lisa Martine Pliscou, is a fourteen year old sophomore student enrolled at Holtville High School, Holtville, California. The plaintiff is before this court seeking a preliminary injunction enjoining the defendants from interfering with the publication of an unofficial student newspaper, The First Amendment.

The plaintiff, acting through her guardian ad litem, alleges that the conduct of the defendants constitutes an unconstitutional interference with her rights guaranteed by the First and Fourteenth Amendments.

The Saga is the official student newspaper published by the journalism class of Holtville High School. During the preceding academic year, 1974–1975, Linda Rombaut served as editor-in-chief of the Saga. The staff of the Saga consisted of an editor-in-chief, an assistant editor and four individual page editors. The publication of the four page student newspaper was under the supervision of Mrs. Edna Harrison, journalism instructor and advisor to the Quill and Scroll Society at Holtville High School.

At the end of the preceding school year, Robert Wynkoop, an instructor at Holtville High, was approached by the school principal, Gerald Beaman, and asked if he would teach journalism and assume responsibility for the publication of the Saga during the next school year, 1975–1976. Mr. Wynkoop accepted the offer and spent the summer months reading various journalism texts in preparation for the fall semester. By the end of the summer, Mr. Wynkoop concluded that he would restructure the staff of the Saga, eliminating the editor-in-chief and assistant editor. Mr. Wynkoop testified that various texts recommended the use of individual page editorships in structuring a newspaper staff with a small number of students having limited experience. The effect of his unilateral decision was a reduction in the size of the managing staff of the Saga.

During the first week of the current school year, Mr. Wynkoop announced to the journalism class that it was his intention to restructure the Saga's staff, limiting it to four page-editors. Wynkoop also determined that the newspaper would not publish any advertisements.

In the interim, Linda Rombaut had designated Lisa Pliscou as her assistant editor, and both students had spent a considerable amount of time during the summer months preparing for the publication of the Saga. Although Mr. Wynkoop eliminated the positions of editor-in-chief and assistant editor, he offered Linda Rombaut and Lisa Pliscou "page" editorships, which they eventually declined. Wynkoop banned advertisements so as to concentrate on the students' writing skills.

The plaintiff is a member of the Quill and Scroll Society, an officially recognized student organization at Holtville High School.[1] The Quill and Scroll is the local chapter of an international journalistic society. During the first meeting of the semester, the plaintiff was elected president of the Quill and Scroll and the membership decided to publish a newspaper. During the second meeting of the semester, the membership named the newspaper the "First Amendment" and began to design the paper's format.

Shortly thereafter, Mrs. Harrison, the sponsor of the Quill and Scroll, advised the plaintiff that the school principal would not authorize the publication of a second newspaper. In response to Mr. Beaman's directive, Mrs. Harrison stated that she felt that she could no longer act as the organization's sponsor.

Mr. Beaman then approached Mr. O. Ray Warren, a member of the Holtville High School faculty, and asked him to act as sponsor of the Quill and Scroll with the understanding that there would be no second newspaper on campus. Mr. Warren assumed this position in addition to his extracurricular responsibilities as coach of the

---

1. Although the plaintiff was elected President of the local chapter of the Quill and Scroll, there is evidence that draws into question the eligibility of the plaintiff, as a sophomore, for membership in the journalistic society. This opinion does not purport to resolve the dispute. At the time of the hearing in this matter, the membership of the Holtville chapter regarded the plaintiff as the organization president. The eligibility of the plaintiff for membership and the attendant consequences of the local Holtville chapter extending membership privileges to sophomores are not matters of judicial concern.

freshman football team and sponsor of the Literary Club.

As an apparent response to these events, on October 16, 1975, the Holtville Unified School District adopted a set of regulations pertaining to the circulation of newspapers, leaflets and other printed matter.

On October 17, 1975, the plaintiff filed an application for a temporary restraining order, and an order issued.[2]

On October 21, 1975, the plaintiff conducted a meeting of the Quill and Scroll at her home to work on the newspaper. Mr. Warren was allegedly informed of this meeting by the plaintiff and Linda Rombaut, but he did not attend.

The plaintiff and other members of the Quill and Scroll sought to publish the First Amendment at no cost to the high school by soliciting advertisements and donations for each issue. In order to solicit advertising, the organization was required to submit an activity request to the school administrators and student council for approval. Mr. Warren, the Quill and Scroll sponsor, refused to authorize the solicitation of advertisements and would not sign the activity request card. The student council, at a meeting on October 22, 1975, determined that it could not approve the activity request without the signature of the sponsor or the school principal.

On October 24, 1975, the Quill and Scroll Society was to meet for the purpose of planning the first edition of the First Amendment newspaper. The plaintiff suggests that an unusually large number of freshman football players attended the meeting, expressing a sudden interest in journalism. The meeting was disorderly and chaotic. Mr. Warren went so far as to characterize the meeting as a "general disturbance".

On the same date, the plaintiff filed an application for an order to show cause why the named defendants in this cause of action should not be held in contempt of court for violating the temporary restraining order issued on October 17, 1975. An order to show cause issued, and the matter was set for hearing on October 30, 1975.

On October 30, 1975, this court stayed the temporary restraining order and continued the contempt hearing to the date of the hearing on the preliminary injunction, November 14, 1975. At that hearing, the plaintiff and defendants presented testimony directed to the motion for a preliminary injunction as well as the contempt question. These matters will be considered separately herein.

The plaintiff seeks the issuance of a preliminary injunction enjoining the defendants from interfering with her right to publish the First Amendment as an on-campus newspaper at Holtville High School.

2. The Temporary Restraining Order and Order to Show Cause, filed October 17, 1975, reads in part, as follows:

Upon the affidavits, complaint and the accompanying memorandum of points and authorities submitted by plaintiff and it appearing to the satisfaction of the Court that this is a proper case for granting a temporary restraining order and order to show cause, and that unless the temporary restraining order prayed for in the complaint be granted, great and irreparable injury will result to plaintiff in that she will be unable to publish THE FIRST AMENDMENT newspaper at Holtville High School and that notice to defendants counsel of plaintiffs application for the temporary restraining order granted herein was given on October 17, 1975.

NOW, THEREFORE, IT IS ORDERED THAT:

Defendant appear before this Court in the Courtroom of the Honorable Gordon Thompson at 325 West F Street, at San Diego, California, on November 3, 1975 at 10:30 A.M. then and there to show cause, if any he has, why he and his agents, servants, employees, representatives, alternates, successors, and anyone connected therewith should not be enjoined and restrained during the pendency of this action from denying plaintiff, LISA MARTINE PLISCOU, the right to publish THE FIRST AMENDMENT as an on-campus newspaper at Holtville High School.

DATED: October 17, 1975

/s/ Edward J. Schwartz

UNITED STATES DISTRICT JUDGE

## STUDENTS' FIRST AMENDMENT RIGHTS

The plaintiff contends that the concerted actions of the defendants deprived her of her First Amendment rights. At the outset, it should be emphasized that the First Amendment rights of high school students are not coextensive with those of adults. In the context of the classroom, one leading commentator has stated:

School authorities . . . may impose more stringent regulations upon the constitutional rights of minors than upon those of adults . . . the power of the state to control the conduct of children reaches beyond the scope of its authority over adults. . . . Emerson, Toward a General Theory of the First Amendment, 72 Yale L.J. 877, 938–939 (1963), cited with approval in *Ginsberg v. New York*, 390 U.S. 629, 638 n.6, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).

Nevertheless, the authority of school officials to regulate the students' exercise of constitutional rights cannot be used to deprive those students of their rights altogether. As the Supreme Court stated in *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731, 737 (1969):

It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.

The scope of a student's rights is determined in light of the special characteristics of the school environment. The latitude afforded students can be circumscribed by reasonable rules and regulations necessary to the orderly administration of the school system. Students may exercise their First Amendment rights provided they do so without "materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school and without interfering with the rights of others." *Id.* at 513, 89 S.Ct. at 740, 21 L.Ed.2d at 741. In *Scoville v. Bd. of Education of Joliet TP. H. S. Dist. 240, etc., Ill.*, 425 F.2d 10 (7th Cir. 1970), the court recognized that school officials have a "comprehensive authority" to prescribe and control conduct in the school through reasonable rules and regulations consistent with the Constitution. However, if any of those rules infringe on constitutional rights, the school authorities bear the burden of justification.

Lisa Pliscou urges that the actions of the defendants compromise her First Amendment rights, not limited to her freedom to publish. The First Amendment encompasses a number of peripheral rights. In *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the Supreme Court explained:

The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read (citations omitted). . . . . *Id.* at 482, 85 S.Ct. at 1680, 14 L.Ed.2d at 514.

It should be noted that a school district is not required to establish a newspaper. *Joyner v. Whiting,* 477 F.2d 456 (4th Cir. 1973); see *The Luparar v. Stoneman,* 382 F.Supp. 495 (D.Vt. 1974). Once a newspaper is established, its publication cannot be suppressed because of its editorial content.

This court is not of the opinion that the defendants acted in order to suppress editorial comment or regulate the content of the Saga. The testimony is equivocal, but this court cannot conclude that the restructuring of the journalism class and the refusal to authorize the publication of the First Amendment were designed to deprive the plaintiff of a forum or regulate the content of the Saga.

This controversy, unlike *Tinker* and its progeny, does not involve a direct regulation of expression. The case at bar involves the regulation of conduct which incidentally limits speech.

The Holtville school officials recognize the Quill and Scroll Society as a legitimate on-campus organization. Indeed, where an organization complies with the

reasonable directives of the administration, official recognition cannot be arbitrarily denied. *Healy v. James,* 408 U.S. 169, 181, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266, 279 (1972).

■ An officially recognized on-campus organization cannot be dealt with in an arbitrary manner so as to frustrate its legitimate objectives. The regulations of the Holtville School District do not expressly prohibit the publication of the First Amendment newspaper, but as a practical matter, the plaintiff and members of the Quill and Scroll cannot publish the First Amendment newspaper under the existing regulations. It is imperative to note that the plaintiff is not seeking access to school materials or machinery, nor would the publication interfere with the plaintiff's class time. The plaintiff is not seeking financial assistance from the school. The plaintiff does, however, seek authorization to solicit advertising to finance the publication of the newspaper. The plaintiff contends that the First Amendment newspaper cannot remain financially viable without the solicitation of advertisements from the local community. In order to do so, the membership of the Quill and Scroll must secure the approval of the organization's sponsor or the school principal, and this request must be ratified by the student council.

■ School authorities have a legitimate interest in regulating the conduct of students. The regulation of conduct which incidentally limits speech is permissible where there is an important governmental interest in regulating the non-speech aspect of the conduct. *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *Channing Club v. Board of Regents of Texas Tech. Univ.,* 317 F.Supp. 688, 691 (N.D.Tex. 1970).

■ This activity request procedure represents an attempt to regulate student conduct incidental to student expression. Mr. Beaman's refusal to authorize the solicitation of advertisements for the First Amendment was premised upon his concern over depleting the financial resources of the community. The school district regulations attempt to limit the time, place and manner of distribution of printed matter. These limitations apply across the board to all recognized on-campus organizations and are not calculated to suppress the publication of the First Amendment newspaper. The procedure for the approval of activity requests reflects the school authorities' legitimate concern over monitoring the activities of all on-campus organizations. This legitimate interest will sustain an even-handed application of the procedures employed, notwithstanding incidental restriction of First Amendment freedoms.

■ In *United States v. O'Brien, supra,* at 376–377, 88 S.Ct. at 1678, 20 L.Ed.2d at 680, the Court discussed the legitimate interest in regulating conduct that may affect speech, noting:

This Court has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations of First Amendment freedoms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest (citations omitted).

Recognition of a student organization impliedly includes those rights necessary to the functioning and growth of the organization. In this instance, the right to publish and distribute a newspaper would appear to be incidental to official recognition of the Quill and Scroll. School officials cannot impinge upon the First Amendment rights

of the members of the Quill and Scroll by arbitrarily denying their activity request to solicit advertising. The Equal Protection Clause compels state authorities to deal with similarly situated organizations in an even-handed manner.

■ In withholding approval of the Quill and Scroll's activity request, Mr. Beaman and Mr. Warren voiced similar concerns. Mr. Beaman testified that it was "not in the school's best interest to oversaturate the community with fund-raising." He continued: "One school newspaper should suffice, and in our case, one paper does." Singling out the Quill and Scroll Society and denying its activity request, in deference to the fund-raising activities of other organizations, would constitute a denial of equal protection. Viewed in its entirety, the denial of the proffered activity request stands suspect and will not be condoned, especially where First Amendment considerations loom in the background.

The defendants have not promulgated any guidelines for the approval of activity requests. From this court's vantage point, the selective denial of the plaintiff's activity request constitutes a denial of equal protection. School authorities may promulgate reasonable regulations limiting student conduct, but these regulations cannot be applied in an arbitrary manner. While the activity request procedure appears to be a legitimate exercise of the school officials' authority, as applied to this plaintiff, the school authorities may have applied the procedure in an uneven fashion, denying the plaintiff equal protection under the law.

## HOLTVILLE SCHOOL REGULATIONS

■ The school district is not, however, precluded from adopting reasonable restrictions upon the time, place and manner in which printed matter may be distributed on school premises. *See Grayned v. City of Rockford,* 408 U.S. 104, 105, 92 S.Ct. 2294, 2297, 33 L.Ed.2d 222, 225 (1972). "The Holtville Unified School District Policy on Campus Circulation of Newspapers, Leaflets and Other Printed Matter" represents the school board's attempt to formulate reasonable restrictions.[3] The authority to regulate is not limitless, and a review of these regulations indicates that certain provisions cannot withstand judicial scrutiny. In order to resolve the instant dispute, this court will turn to those regulations that appear to be troublesome.

Regulation 3(c) provides:

A copy of any printed matter proposed for distribution shall be presented to the Principal prior to distribution.

This regulation does not specifically authorize a ban on distribution or call for the

---

**3.** Holtville Unified School District Policy on Campus Circulation of Newspapers, Leaflets and Other Printed Matter (Adopted October 16, 1975):

I. On Campus Circulation of Newspapers, Leaflets, Other Printed Matter.
Students are allowed to distribute leaflets, newspapers and other printed matter subject to the following limitations:
1. Time: The time of distribution shall be such as will not disrupt classes or activities.
2. Place: The place of distribution shall be such areas and in such manner as will not restrict the normal flow of traffic within buildings, outside corridors, and entrance ways.
3. Manner: The manner of distribution shall be subject to the following conditions:
A. Coercion shall not be used to induce students to accept or sign printed matter.
B. The distribution process shall be limited to matriculated students in such number as will not cause disruption of classes or activities.
C. A copy of any printed matter proposed for distribution shall be presented to the Principal prior to distribution.
D. Any such printed matter must contain a disclaimer clause as follows:
"This publication does not necessarily reflect the views of the Holtville Unified School District."
E. Funds or donations shall not be collected for newspapers and other printed matter distributed.
F. In order to avoid littering newspapers and other printed materials shall not be left unattended and subject to wind dispersal.
G. No printed material which is obscene by legal definition may be distributed.
H. No material that incites students toward the disruption of the orderly operation of the school may be distributed.

prior approval of the school principal. However, in light of the other regulations, 3(c) appears to be a means of prior restraint. The other regulations limit the type of material that may be distributed, and it appears that the principal is delegated the authority to interpret and apply these regulations. Viewed as such, this provision resembles the regulation in *Quarterman v. Byrd,* 453 F.2d 54 (4th Cir. 1971), where the court held that school authorities could exercise prior restraint upon publications distributed on school premises if they could reasonably forecast that the distributed publication would cause a substantial disruption or a material interference with school activities. A prior restraint cannot stand in the absence of any criteria to be followed by the authorities in determining whether to allow distribution and in the absence of any safeguards providing for an expeditious review of the decision of the school authorities. As in *Quarterman,* regulation 3(c) is an invalid restraint because it fails to specify a reasonable period of time within which the principal must act. Moreover, the regulation fails to provide for the contingency of the principal's failure to act within the specified time. For these reasons, regulation 3(c) cannot stand in its present form.

Regulation 3(e) reads:

Funds or donations shall not be collected for newspapers and other printed matter distributed.

The sale of a newspaper is conduct mixing both speech and non-speech elements. As the court in *Jacobs v. Board of School Commissioners,* 490 F.2d 601 at 608, 7 Cir. 1973, stated:

[B]ecause students have first amendment rights within the school, as recognized in *Tinker,* we think that the propriety of regulation of their conduct involving the exercise of protected rights must be independently justified.

A blanket ban on the sale of newspapers has been declared not to be a legitimate exercise of a school district's power to regulate the time, place and manner of distribution. *Sullivan v. Houston Independent School District,* 333 F.Supp. 1149 at 1162, D.C.Tex. Similarly, this regulation falls as an illegitimate exercise of the school board's authority.

Regulation 3(h) reads as follows:

No material that incites students toward the disruption of the orderly operation of the school may be distributed.

*Jacobs v. Board of Commissioners, supra,* considered a provision similar to this regulation. In fact, it was more limited in that the distribution would be prohibited only if the material would "significantly" disrupt the educational process. The court, nevertheless, found the regulation unconstitutionally vague and overbroad. The *Jacobs* court applied the vagueness test established for criminal statutes in *Grayned v. City of Rockford, supra,* concluding that expulsion or other severe disciplinary action warranted the application. These penalties were deemed to be sufficiently grievous to dictate strict scrutiny for vagueness. In light of the possible consequences to the plaintiff for noncompliance with the instant regulations, this court will apply the *Grayned* test. The court is not of the opinion that a less exacting standard would be appropriate.

A law is vague if it does not provide explicit standards for its enforcement. The court, in *Jacobs,* held the school regulation to be vague because those consequences making a distribution unlawful were not defined. Thus, the regulation suffers from overbreadth and vagueness. Furthermore, *Tinker, supra,* requires that the word "disruption" be modified by the word "material". First Amendment rights are not to be interfered with absent a foreseeable "material" disruption in the orderly functioning of the classroom. In *Braxton v. Municipal Court,* 10 Cal.3d 138, 109 Cal. Rptr. 897, 514 P.2d 697 (1973), the court construed the word "disruption" in a school penal regulation to mean a physical disruption which constitutes a substantial material threat to the orderly operation of the campus.

The regulation here under consideration does not indicate who is to interpret and

apply it. If this authority is vested in the principal, the regulation is infirm for the additional reasons noted when discussing regulation 3(c).

In accordance with the analysis above, the regulations adopted by the school district cannot, as a whole, withstand judicial scrutiny. After excising those regulations which impermissibly infringe upon the students' rights, what remains is a compilation of rules that do not preclude the plaintiff from exercising her First Amendment rights to publish and receive information through the instrumentality of the First Amendment newspaper.

██ The failure of the school officials to approve the plaintiff's activity request to seek out advertising does not rest upon any rational justification—nor does there appear to be one. An even-handed application of school procedures dictates approval of the activity request. The plaintiff and the organization which she is a member of cannot be singled out and denied access to the community. First Amendment rights enjoy a "preferred" status, and no justification has been offered that would warrant denying the instant request.

In conformity with the opinion of this court, the plaintiff should submit the activity request to the appropriate officials for approval, and in light of existing policy, the request must be approved. This order is not to preclude the school board from promulgating reasonable regulations that apply to all students and campus groups even-handedly, but a ruse to stifle First Amendment rights cannot stand.

## THE PRELIMINARY INJUNCTION

There are two alternative tests for determining whether a preliminary injunction should issue, and this court is required to determine if an injunction would be proper under either test. *Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc., et al.,* 526 F.2d 86 (9th Cir. 1975).

██ Under one set of criteria, a plaintiff is entitled to a preliminary injunction if (1) the plaintiff will suffer irreparable inju-

ry if the injunction does not issue; (2) there is a "strong likelihood" that the plaintiff will prevail on the merits; (3) the defendants will not be damaged more than the plaintiff is benefited by the injunction; and (4) granting the injunction is in the public interest. *Sierra Club v. Hickel,* 433 F.2d 24, 33 (9th Cir. 1970), *aff'd* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

██ The alternative test for granting a preliminary injunction requires the moving party to demonstrate that "serious questions are raised and the balance of hardships tips sharply in his favor." *Charlie's Girls, Inc. v. Revlon, Inc.,* 483 F.2d 953, 954 (2nd Cir. 1973).

██ Under either test, the plaintiff's showing falls short. Lisa Pliscou has not demonstrated, to this court's satisfaction, a "strong likelihood" that she will prevail on the merits. Furthermore, this court cannot conclude that the questions going to the merits are of sufficient doubt and gravity as to require the court to issue a preliminary injunction at this time.

## THE CONTEMPT CITATION

This court will now turn its attention to the contempt citation. The plaintiff urges that the defendants be held in contempt for failing to comply with the terms of the temporary restraining order issued on October 17, 1975.

Reference must be made to rule 65(d) of the Federal Rules of Civil Procedure, which provides as follows:

> Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

Professor Moore commented:

[Rule 65(d)] compels preciseness in the form and scope of restraining orders and injunctions in order to apprise the party enjoined of the course of conduct which is prohibited; and to avoid undue restraint on parties to the action or others affected by the restraint (citations omitted). 7 Moore's Federal Practice ¶ 65.11, p. 1667.

The temporary restraining order in this case fails to conform to the provisions of rule 65(d) and this court finds these terms to be mandatory. *Alberti v. Cruise*, 383 F.2d 268 (4th Cir. 1967). This restraining order is too broad to be given effect. The instant order cannot be said to apprise the defendants of what conduct is prohibited. If this court were to find these defendants in contempt for failure to adhere to the terms of the October 17th restraining order, it would be taking a draconian approach to the law.

The defendants will not be cited for contempt in view of the lack of certainty as to what the temporary restraining order prohibited or directed. *In re Rubin*, 378 F.2d 104 (3rd Cir. 1967).

In light of the discussion above, the defendants are given thirty days from the date of this opinion to remedy the deficiencies in the school district regulations. The defendants should proceed in good faith and act in accordance with the foregoing analysis.