**Jeff JACOBS et al., Plaintiffs-Appellees,**

v.

**The BOARD OF SCHOOL COMMISSIONERS, etc., et al., Defendants-Appellants.**

**No. 72-2030.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 19, 1973.

Decided Dec. 14, 1973.

Lawrence McTurnan, Lila J. Young, Indianapolis, Ind., for defendants-appellants.

Craig Eldon Pinkus, Ronald E. Elberger, Indianapolis, Ind., for plaintiffs-appellees.

Before FAIRCHILD and CUMMINGS, Circuit Judges, and CHRISTENSEN,* Senior District Judge.

FAIRCHILD, Circuit Judge.

Defendants are officials of the Indianapolis school system. They appeal from a judgment enjoining the enforcement of certain rules governing the distribution by students of communicative written materials within the Indianapolis

public school buildings and upon the grounds of such buildings. The named plaintiffs were or had been high school students when the action was started. They challenged defendants' suppression of an unofficial student newspaper, entitled the Corn Cob Curtain, in the publication and distribution of which plaintiffs had participated. The relevant rules of the Board were amended while the action was pending. The decision and judgment appealed from are reported, Jacobs v. Board of School Com'rs of City of Indianapolis, 349 F.Supp. 605 (S.D.Ind., 1972).

### 1. *Refusal to appoint a guardian ad litem.*

Plaintiffs were minors, represented by counsel. They alleged that activities of defendants violated their first and fourteenth amendment rights. They sued on behalf of themselves and all other high school students under defendants' jurisdiction. They primarily sought injunctive relief except that they also prayed for $150 compensatory damages and nominal or other punitive damages. Except for the prayer for damages in modest amount, plaintiffs won.

■ The district court denied defendants' petition for appointment of a guardian ad litem. Under the present circumstances, it is doubtful that defendants have a sufficient interest to raise this point on appeal. There is little reason to suppose that defendants would be exposed to any risk as a result of a claim that plaintiffs or class members are not bound by the judgment because there was no personal representative, next friend, or guardian ad litem. In Roberts v. Ohio Casualty Insurance Company, 256 F.2d 35 (5th Cir., 1958), relied on by defendants, and where a judgment was reversed for failure to appoint, it was the unrepresented minor who sought reversal. Nevertheless, defendants argue that the judgment should be reversed on this ground.

* Senior District Judge A. Sherman Christensen, of the District of Utah, is sitting by designation.

Rule 17(c), F.R.Civ.P., provides in part: "The court shall appoint a guardian ad litem for an infant or incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of the infant or incompetent person."

Defendants apparently concede that neither the appointment of a guardian ad litem nor a protective order in lieu thereof is mandatory, and neither is required if the court considers the matter and makes a judicial determination that the infant is protected without a guardian. *Roberts, supra*, p. 39. See Till v. Hartford Accident & Indemnity Co., 124 F.2d 405, 408 (10th Cir., 1941); Westcott v. United States Fidelity & Guaranty Co., 158 F.2d 20, 22 (4th Cir., 1946).

Here the question was argued and considered. We do not agree with defendants that the court's emphasis, in its oral ruling, on the fact that constitutional issues were presented, and that substantial monetary recovery was not sought, demonstrates a failure to decide the appropriate question. Moreover, there is nothing in the record which indicates that the minors were represented inadequately or that any party was prejudiced by the absence of a guardian ad litem. See *Till* and *Westcott, supra*, and Rutland v. Sikes, 203 F.Supp. 276 (E.D. S.C., 1962), aff'd on other grounds, 311 F.2d 538 (4 Cir.), cert. denied 374 U.S. 830, 83 S.Ct. 1871, 10 L.Ed.2d 1053.

## 2. *The Constitutionality of the Board's Regulations.*

During the 1971–1972 public school term, five issues of the Corn Cob Curtain were published. They contained letters, articles about politics, education, student affairs, religion, and American history, music, movie, and book reviews, poetry, and cartoons. The first four issues were distributed in Indianapolis high schools. At the time the fifth issue was ready for distribution, school authorities notified the student population that school board rules prohibit sales or solicitations on school grounds without the express prior approval of the General Superintendent. After conferring with various school officials, the named plaintiffs were informed that the Corn Cob Curtain could no longer be distributed because it contained obscene materials. Appellees refrained from distributing the fifth issue pending resolution of these issues in the courts.

At the time of the above events, Sections 11.05 and 11.06 of the Board's rules prohibited the sale or distribution of literature in the public schools without express prior approval of the General Superintendent. After the district judge stated his belief that these rules were unconstitutional prior restraints under Fujishima v. Board of Education, 460 F.2d 1355 (7th Cir., 1972), the defendants amended the rules to their present form. The district court held that the amended rules were unconstitutional.

■ The amended rules involved are set forth at 349 F.Supp. 607–609. Rule 11.05 consists of a series of numbered items or paragraphs, designated in the district court judgment as provisos. We adopt that term, and proceed to consider the arguments made by defendants with respect to them.

### (a) *Amended Rule11.05, Proviso 1.1.1.3.*

Reading provisos 1.1.1. and 1.1.1.3 together, they provide:

"No student shall distribute in any school any literature that is . . . either by its content or by the manner of distribution itself, productive of, or likely to produce a significant disruption of the normal educational processes, functions or purposes in any of the Indianapolis schools, or injury to others."

The district court held that this rule was both vague and overbroad. We agree.

It is well established that a criminal statute is void for vagueness if its prohibitions are not clearly defined. Grayned v. City of Rockford, 408 U.S.

104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); United States v. Dellinger, 472 F.2d 340, 355 (7th Cir., 1972), cert. denied 410 U.S. 970, 93 S.Ct. 1443, 35 L. Ed.2d 706. Vague laws are constitutionally offensive for several reasons:

"First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.' Uncertain meanings inevitably lead citizens to ' "steer far wider of the unlawful zone" . . . than if the boundaries of the forbidden areas were clearly marked.' " *Grayned, supra*, 408 U.S. at 108–109, 92 S.Ct. at 2299, footnotes omitted.

Here, there is no criminal statute before us. Nonetheless, a student who violates amended Rule 11.05 is subject to suspension or expulsion or other disciplinary action. Proviso 1.61. We conclude that the penalties for violation are sufficiently grievous to mandate careful scrutiny for vagueness. *See generally* Baggett v. Bullitt, 377 U.S. 360, 374, 84 S. Ct. 1316, 12 L.Ed.2d 377 (1964). We note the substantial danger of inade-

quate warnings to students, of arbitrary enforcement by teachers and principals, and of inhibition of full exercise of students' first amendment rights.

We think that proviso 1.1.1.3 is vague in defining the consequences which will make a distribution of literature unlawful. Those consequences are articulated as "a significant disruption of the normal educational processes, functions, or purposes in any of the Indianapolis schools, or injury to others." Is decorum in the lunchroom a "normal educational . . . purpose"? If an article sparks strident discussion there, is the latter a "disruption"? When does disruption become "significant"? The phrase "injury to others" is also vague. Does it mean only physical harm? Does it include hurt feelings and impairment of reputation by derogatory criticism, short of defamation, since libelous material is already covered by proviso 1.1.1.2?

Defendants argue unpersuasively that proviso 1.1.1.3 is not over-vague because of its similarity to the text of the standard by which the Supreme Court tested a precise regulation against wearing armbands in Tinker v. Des Moines School Dist., 393 U.S. 503, 514, 89 S.Ct. 733, 21 L.Ed.2d 731.[1] It does not at all follow that the phrasing of a constitutional standard by which to decide whether a regulation infringes upon rights protected by the first amendment is sufficiently specific in a regulation to convey notice to students or people in general of what is prohibited.[2]

Proviso 1.1.1.3 is also unconstitutionally overbroad. In United States v. Dellinger, *supra*, 472 F.2d at 357, this court stated: "The doctrine of overbreadth applies when a statute lends itself to a substantial number of impermissible applications, such that it is capable of deterring protected conduct,

---

1. In *Tinker*, the Supreme Court held that a state may restrain students from fully exercising their first amendment rights only if it is demonstrated that the school authorities reasonably forecast substantial disruption of or material interference with school activi-

ties or discipline. *Tinker, supra* 393 U.S. at 514, 89 S.Ct. 733.

2. *E. g.*, Miller v. California, 413 U.S. 15, 26, 93 S.Ct. 2607, 2616, 37 L.Ed.2d 419 (1973).

when the area affected by the challenged law substantially involves first amendment interests, and when there is not a valid construction which avoids abridgement of first amendment interests." (footnotes omitted). These factors are present here.

The overbreadth stems both from the vagueness described above and from the inclusiveness of the phrase "productive of, or likely to produce" in the proviso. Expression may lead to disorder under many circumstances where the expression is not thereby deprived of first amendment protection. See Braxton v. Municipal Court, 10 Cal.3d 138, 109 Cal. Rptr. 897, 514 P.2d 697 (1973). We do not read *Tinker* as authorizing suppression of speech in a school building in every such circumstance where the speech does not have a sufficiently close relationship with action to be treated as action. See *Dellinger, supra,* 472 F.2d at 360.

█ █ Where the boundaries between prohibited and permissible conduct are ambiguous, we can not presume that the curtailment of free expression is minimized. NAACP v. Button, 371 U.S. 415, 432, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); United States v. Dellinger, *supra,* 472 F.2d at 356–357. Instead the plaintiffs are permitted to attack the regulation by suggesting impermissible applications without demonstrating that their own conduct "could not be regulated by a statute drawn with the requisite narrow specificity." Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965). See Gooding v. Wilson, 405 U.S. 518, 521, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). Proviso 1.1.1.3 at least threatens a penalty for a student who distributed a controversial pamphlet in a lunchroom resulting in robust arguments or who distributed a newspaper including derogatory but not defamatory remarks about a teacher. Absent extraordinary circumstances, the school authorities could not reasonably forecast substantial disruption of or material interference with school discipline or activities arising from such incidents.

See *Tinker, supra.* Finally, we note that this court lacks jurisdiction to place an authoritative limiting construction upon this state regulation in contrast with the power of federal courts with respect to interpretation of federal statutes or regulations. United States v. 37 Photographs, 402 U.S. 363, 369, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971), cert. denied 403 U.S. 924, 91 S.Ct. 2221, 28 L. Ed.2d 702.

(b) *Amended Rule 11.05, Proviso 1.1.1.4.*

█ Reading provisos 1.1.1 and 1.1.-1.4 together, they provide:

"No student shall distribute in any school any literature that is . . . not written by a student, teacher, or other school employee; provided, however, that advertisements which are not in conflict with other provisions herein, and are reasonably and necessarily connected to the student publication itself shall be permitted."

We have no doubt that this rule abridges first amendment rights of plaintiffs, although not for the reason assigned by the district court. Whether the student distribution of literature be viewed as individual speech or as press publication, we think that authorship by a non-school person of the material distributed is not germane to any of the constitutional standards which must be met before conduct which is also expression can be prohibited.

Defendants suggest that student distribution of materials written by non-students and outside organizations tends to produce disorder and interference with school functions, and cite the example that "stores would undoubtedly pay students to distribute flyers advertising their products." Assuming, however, some area of possible validity, the rule is overbroad. It would prohibit use of materials written by individuals from all sorts of walks of life whose views might be thought by the students to be worthy of circulation. "Predictions about imminent disruption . . . involve judg-

ments appropriately made on an individualized basis, not by means of broad classifications, especially those based on subject matter." Police Department of Chicago v. Mosley, 408 U.S. 92, 100, 92 S.Ct. 2286, 2293, 33 L.Ed.2d 212 (1972).

### (c) Amended Rule 11.05, Proviso 1.3.1.6.

■ Literature not proscribed under 1.1.1, 1.1.1.1 to 1.1.1.4, is referred to as 'distributable literature." (Proviso 1.-1.2). Reading provisos 1.3.1 and 1.3.1.6 together, they provide:

> "No distributable literature shall be distributed by any student in any school . . . unless the name of every person or organization that shall have participated in the publication is plainly written in the distributable literature itself."

In Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960), the Supreme Court held invalid a city ordinance prohibiting the distribution of handbills in any place unless the handbills disclosed the names and addresses of the persons who printed, wrote, manufactured and distributed the handbills. Noting the historical importance of anonymous publications as a vehicle for criticizing oppressive practices and laws, the Court held that the broad prohibition of the ordinance violated the first amendment. Talley, supra, 63–65, 80 S.Ct. 536.[3]

Anonymous student publications perform similarly within the school community; without anonymity, fear of reprisal may deter peaceful discussion of controversial but important school rules and policies. Although the rule leaves students free to distribute anonymous literature beyond the school house gate, the question here, as in Tinker, is whether the state has demonstrated a sufficient justification for this prohibition within the school community, where students

and teachers spend a significant portion of their time. See Tinker, supra, 393 U.S. 506, 89 S.Ct. 733. Defendants contend that the names of persons who have "participated in the publication" of literature must be provided so that those responsible for the publication of libelous or obscene articles can be held accountable. However, here as in Talley, the requirement is not limited to material as to which such justification might be urged. Indeed, if the regulation be read literally, 1.3.1.6 applies only to literature the content of which is acceptable. School authorities could not reasonably forecast that the distribution of any type of anonymous literature within the schools would substantially disrupt or materially interfere with school activities or discipline. See Tinker, supra, 514, 89 S.Ct. 733.

### (d) Amended Rule 11.05, Proviso 1.3.1.5 and Rule 11.06.

■ Reading 1.3.1 and 1.3.1.5 together, they provide:

> "No distributable literature shall be distributed by any student in any school . . . in immediate exchange for money or any other thing of value . . ., whether the transaction is characterized as a sale of the distributable literature, as a contribution to finance the publication or distribution of the distributable literature, or as any other transaction whereunder money or any other thing of value (or a promise of either) immediately passes to or for the direct or indirect benefit of the student who is distributing the distributable literature. . . ."

Amended Rule 11.06 provides that:

> "No person, including students and organizations or corporations, other than the school corporation acting through its designated agents, or or-

---

3. We note that in the recent case of Branzburg v. Hayes, 408 U.S. 665, 680 ff, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the Supreme Court carefully distinguished the question of whether a newspaper reporter must respond to a grand jury subpoena from the question of whether the press could be required to publish or indiscriminately disclose all its sources.

ganizations of parents and teachers or students whose sole use of funds is for the benefit of the particular school in which they are organized or in attendance, may sell merchandise or material, collect money, or solicit funds or contributions from the students for any cause or commercial activity within any school or on its campus."

Plaintiffs suggest that these rules were adopted to accomplish indirectly that which can not be accomplished directly: the blanket prohibition of the distribution of the Corn Cob Curtain and other similar student newspapers. Plaintiffs alleged the dependence of the paper upon contributions of money for survival. It can readily be observed that a ban upon the receipt of contributions on school grounds would create financial difficulties in raising the $120 to $150 necessary to publish each edition of the Corn Cob Curtain. In Grosjean v. American Press Company, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1935), the Supreme Court considered the constitutionality of a Louisiana tax upon the advertising revenue of newspapers with a circulation of more than 20,000 copies per week. After finding that the effect of the tax might be to destroy both the advertising and circulation of the newspapers and noting with suspicion the form of the tax, the Court concluded that the tax was a "deliberate and calculated device . . . to limit the circulation of information to which the public is entitled," in violation of the first amendment. *Grosjean, supra,* 244, 250, 56 S.Ct. 444, 449.

Assuming, however, that the rules are not a "deliberate and calculated device" to suppress the student newspaper, it becomes necessary to analyze the justification offered by defendants. They assert the legitimacy of an interest in preventing the use of school premises "for non-school purposes—particularly commercial activities." Rule 11.06 is a general prohibition against sales of materials and solicitation of funds except for the benefit of the school. If there were any question of its intended applicability to sales by students of their unofficial newspaper, proviso 1.3.1.5 makes specific application.

We have little question of the legitimacy of the interest of the school authorities in limiting or prohibiting commercial activity on school premises by persons not connected with the school, either acting directly or through students as agents. But because students have first amendment rights within the school, as recognized in *Tinker*, we think that the propriety of regulation of their conduct involving the exercise of protected rights must be independently justified. It is not enough to say that such activity by students is similar to commercial activity by others.

Sale of the newspaper, or other communicative material within a school, is conduct mixing both speech and non-speech elements. In order to determine whether a "sufficiently important governmental interest in regulating the non-speech element can justify incidental limitations on First Amendment freedoms," we must consider whether the regulation "is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L. Ed.2d 672 (1968), reh. denied 393 U.S. 900, 98 S.Ct. 63, 21 L.Ed.2d 188.

Ultimately, defendants rely on the proposition that "Commercial activities are time-consuming unnecessary distractions and are inherently disruptive of the function, order and decorum of the school."

Provisos 1.3.1.2, .3 and .4 already regulate the place and manner of distribution so as to avoid interference with others and littering. They have not been challenged here. It has not been established, in our opinion, that regulation of the place, time, and manner of distribu-

tion can not adequately serve the interests of maintaining good order and an educational atmosphere without forbidding sale and to that extent restricting the first amendment rights of plaintiffs.

### (e) Amended Rule 11.05, proviso 1.3.1.1.

Reading provisos 1.3.1 and 1.3.-1.1. together, they provide:

"No distributable literature shall be distributed by any student in any school . . . while classes are being conducted in the school in which the distribution is to be made."

It is well established that the right to use public places for expressive activity is not absolute and that "reasonable 'time, place and manner' regulations [which] may be necessary to further significant governmental interests" are constitutionally permissible. Grayned v. City of Rockford, 408 U.S. 104, 115, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), and cases cited therein. The question here is whether the Board could reasonably forecast that the distribution of student newspapers anywhere within a school at any time while any class was being conducted would materially disrupt or interfere with school activities and discipline. See Grayned v. City of Rockford, supra at 118, 92 S.Ct. at 2294. In determining whether "the manner of expression is basically incompatible with the normal activity of a particular place at a particular time, . . . we must weigh heavily the fact that communication is involved [and] the regulation must be narrowly tailored to further the State's legitimate interest." Grayned v. City of Rockford, supra at 116–117, 92 S.Ct. at 2304.

We are hampered in evaluating proviso 1.3.1.1 by the paucity of evidence in the record with respect to arrangements and schedules of classes in the Indianapolis secondary schools. Nonetheless, it does appear that there are periods in the morning, around noon, and in the late afternoon when, although some classes are in session, substantial numbers of students are on the premises, are not involved in classroom activity, and are barred by proviso 1.3.1.1 from distributing and indirectly from receiving student newspapers. We conclude that the defendants have not satisfied their burden of demonstrating that the regulation banning distribution at all these times is narrowly drawn to further the state's legitimate interest in preventing material disruptions of classwork. See Tinker, supra 513, 89 S.Ct. 733.

### 3. Defendants' claim concerning obscenity and profanity.

Defendants' original answer averred, among other things, that plaintiffs' publications are obscene, indecent, vulgar, and profane. While the action was pending, the rules were amended so that when Rule 11.05, provisos 1.1.1 and 1.1.-1.1, are read together, they provide: "No student shall distribute in any school any literature that is . . . obscene as to minors. . . ."

The district court did not directly decide defendants' claim that the existing issues of Corn Cob Curtain were obscene. Presumably the court deemed the proviso valid, for the decision indicates that the appropriate inquiry concerning obscenity would be whether future issues of the paper would be obscene as to minors. The decision, 349 F.Supp. at 610, set forth the then controlling Roth-Memoirs definition of obscenity, the concept of variable obscenity permitting a less exacting standard where material is directed at children, and other limitations to be regarded in making the determination.

Necessarily we observe that proviso 1.1.1.1 lacks the specific definition of sexual conduct the description of which is prohibited as now required for a valid law under Miller v. California, 413 U.S. 15, 26, 93 S.Ct. 2607, 2616, 37 L.Ed.2d 419 (1973).

In any event, a substantial portion of defendants' brief is devoted to what it terms the most crucial issue, "whether school authorities may constitutionally

and legitimately prevent and/or punish the use of defamatory, obscene and indecent language in the school house which is contrary to the moral standards of the community."

■ In the first place, the issues of the Corn Cob Curtain in the record are very far from obscene in the legal sense. A few earthy words relating to bodily functions and sexual intercourse are used in the copies of the newspaper in the record. Usually they appear as expletives or at some similar level. One cartoon depicts a sequence of incidents in a bathroom. This material amounts only to a very small part of the newspapers; which are tabloid size, containing eight or twelve pages. These issues contain no material which is in any significant way erotic, sexually explicit, or which could plausibly be said to appeal to the prurient interest of adult or minor. See Cohen v. California, 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971).

In *Miller, supra,* the Supreme Court limited the scope of the obscenity exception to first amendment protection to "works which depict or describe sexual conduct" and "which, taken, as a whole, appeal to the prurient interest in sex, which portray, sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value." Clearly the newspaper issues in the record do not even approach fulfillment of this defnition.

Nor need we speculate about the exact effect of *Miller* on the variable obscenity concept exemplified by Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L. Ed.2d 195 (1968). Making the widest conceivable allowances for differences between adults and high school students with respect to perception, maturity, or sensitivity, the material pointed to by defendants could not be said to fulfill the *Miller* definition of obscenity.

■ It is well established that a distinction must be drawn between obscene materials and non-obscene materials containing profanity. Cohen v. California,

403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed. 2d 284 (1971); Fujishima v. Board of Education, 460 F.2d 1355, 1359 n. 7 (7th Cir., 1972). The only possible question is whether the Board's educational responsibilities justify its preventing the use by students in these circumstances of words considered coarse or indecent. Clearly a university can not constitutionally regulate expression on that ground. Papish v. University of Missouri Curators, 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973). Although there is a difference in maturity and sophistication between students at a university and at a high school, we conclude that the occasional presence of earthy words in the Corn Cob Curtain can not be found to be likely to cause substantial disruption of school activity or materially to impair the accomplishment of educational objectives. Scoville v. Board of Ed. of Joliet T.P.H.S. Dist. 204, Etc., Ill., 425 F.2d 10, 13 (7th Cir., 1970).

The injunction is broad enough to cover enforcement of the particular rules at all schools under the jurisdiction of defendants. At oral argument, plaintiffs conceded that their case was limited to the application of the rules in high schools. We therefore had no occasion to decide whether or not age difference and the like would lead to a different ruling concerning elementary schools. Should defendants apply to the district court to limit the injunction to high schools, nothing in this decision forecloses the consideration of the application on its merits.

The judgment appealed from is affirmed.

———

CHRISTENSEN, Senior District Judge (concurring in part and dissenting in part):

I am in general agreement with the majority opinion as it relates to the guardian ad litem problem and the invalidity of Provisos 1.1.1.4, 1.3.1.6, 1.3.1.5 and 1.3.1.1 of Rule 11.05, and Rule 11.06 of the appellant board.

I dissent, however, from those parts of the opinion holding that Rule 11.05, Proviso 1.1.1.3, is invalid for vagueness and overbreadth * and that certain language used in the Corn Cob Curtain was not "obscene as to minors" in the high school context and thus in contravention of Amended Rule 11.05, Proviso 1.1.1.

And I find myself in disagreement with the conclusion "that the occasional presence of earthy words in the Corn Cob Curtain cannot be found to be likely to cause substantial disruption of school activity or materially to impair the accomplishment of educational objectives". The euphemisms employed to describe contents of the publication do not fully indicate the type of language and imagery that are given rein; whether constituting the predominant part, or merely an inescapably dominating part of any particular issue, it seems clear that expressions are used which in a high school, not to mention an elementary school would materially impair the accomplishment of educational objectives.

More likely obscene in these contexts are certain Corn Cob expressions than those involved in Papish v. University of Missouri Curators, 410 U.S. 667, 93 S. Ct. 1197, 35 L.Ed.2d 618 (1973), would be in the setting of a university. Hence, it may not be presumptuous to suppose that when a situation is evaluated corresponding to the one we have before us the majority of that court may be inclined to accept an extrapolation of the views expressed in the dissent of the Chief Justice to the effect that preclusion of the regulation of such material by school authorities would not protect values inherent in the First Amendment but would demean them (410 U.S. at p. 672, 93 S.Ct. 1197), and those of Mr. Justice Rehnquist, with whom the Chief Justice and Mr. Justice Blackmun joined, that "insistence on equating, for constitutional purposes, the authority of the State to criminally punish with its authority to exercise even a modicum of

control over the university [high school or elementary school] which it operates serves neither the Constitution nor public education well." (410 U.S. at p. 677, 93 S.Ct. at p. 1202.)

That at oral argument "plaintiffs conceded that their case was limited to the application of the rules in high schools" does not seem to me a sufficient reason for our failure to hold as to elementary schools of all places that the trial court's decision involved error. Appellees should not be permitted to waive the contentions of appellants, who have argued here both overbreadth and invalidity of the injunction. To the extent hereinabove indicated, I am of the opinion that appellants are right on both scores. And to that limited extent it appears to me that until now this court, as well as the Supreme Court, has not committed itself to an irreconcilable view.

---

* No determinative difference is perceived between this rule and its rewording which the trial court thought "more apt to be constitutionally acceptable". 349 F.Supp. at pp. 611–612.