[L.A. No. 30555. Dec. 6, 1976.]

SUSANNAH BRIGHT, a Minor, etc., Plaintiff and Appellant, v.
LOS ANGELES UNIFIED SCHOOL DISTRICT et al.,
Defendants and Respondents.

**COUNSEL**

Leon Letwin, Richard Wasserstrom and Fred Okrand for Plaintiff and Appellant.

John H. Larsen, County Counsel, and Richard K. Mason, Deputy County Counsel, for Defendants and Respondents.

Wise, Kilpatrick & Clayton, George E. Wise and Susan E. Anderson Wise as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**SULLIVAN, J.**—In this case we inquire into the right of California public school students to speak and write freely (see U.S. Const., First Amend.; Cal. Const., art. I, § 2) in the school environment and examine the scope and extent of such right in relation to the authority and supervision of school officials. Specifically, we are called upon to determine whether and to what extent, in the light of section 10611 of the Education Code[1] dealing with the students' "right to exercise free

[1]Section 10611 of the Education Code provides: "Students of the public schools have the right to exercise free expression including, but not limited to, the use of bulletin boards, the distribution of printed materials or petitions, and the wearing of buttons, badges, and other insignia, except that expression which is obscene, libelous, or slanderous according to current legal standards, or which so incites students as to create a clear and present danger of the commission of unlawful acts on school premises or the violation of lawful school regulations, or the substantial disruption of the orderly operation of the school, shall be prohibited.

"Each governing board of a school district and each county superintendent of schools shall adopt rules and regulations relating to the exercise of free expression by students upon the premises of each school within their respective jurisdictions, which shall include reasonable provisions for the time, place, and manner of conducting such activities."

Hereafter, unless otherwise indicated, all section references are to the Education Code.

expression," school authorities may require the submission, for approval prior to distribution on school premises, of so called "alternative" or "underground" newspapers produced by the students off campus. As will appear, we conclude that the pertinent statute does not authorize any such prior restraint by school officials and that rules and regulations adopted by a school district insofar as they purport to effectuate it are void.

Plaintiff Susannah Bright, in May 1974 a 10th grade student at University High School (school) in Los Angeles, was a writer for the Red Tide, a newspaper intended for distribution to high school students, but produced independently of the public school system. On Friday, May 31, 1974, plaintiff and two other students of the school, desiring to distribute the then current edition of the paper, in accordance with the rules of defendant Los Angeles Unified School District[2] (District) submitted a copy of the paper to defendant Homer Gansz, the assistant principal. Gansz noticed on the front page of the Red Tide an article entitled "Students Fight Rules at Locke," concerning a dress code at Locke High School which prohibited male students from wearing hats in class. A portion of the article also on the front page, under a subheading

---

[2]Los Angeles School Board Administrative Regulation 1276-1 provides in pertinent part:

"The procedures to be followed in the implementation of guidelines relating to student expression on campus are as follows:

"a. Circulation of Petitions, Circulars, Newspapers, and Other Printed Matter. Students should be allowed to distribute petitions, circulars, leaflets, newspapers, and other printed matter subject to the following limitations:

" . . . . . . . . . . . . . . . .

"d. Prohibited Material.

"1. Material which is obscene to minors according to current legal definitions:

"2. Material which is libelous according to current legal definitions.

"3. Material which incites students so as to create a clear and present danger of the imminent commission of unlawful acts or of the substantial disruption of the orderly operation of the school.

"4. Material which expresses or advocates racial, ethnic, or religious prejudice so as to create a clear and present danger of imminent commission of unlawful acts or of the substantial disruption of the orderly operation of the school.

"5. Material which is distributed in violation of the time, place, and manner requirements.

"e. Disciplinary Action.

"Any student who wilfully and knowingly:

"1. distributes any petitions, circulars, newspapers, and other printed matter;

"2. wears any buttons, badges, or other insignia;

"3. posts on a bulletin board any item in violation of the aforementioned prohibitions should be suspended, expelled or otherwise penalized depending on the severity of the violation, and in accordance with established disciplinary procedures."

The students at University High School were apprised of the Board regulations and

"Principal Lies"[3] raised a question in Gansz' mind as to whether the article was libelous. Accordingly, he informed the three students that he could not immediately approve distribution of the paper but would have to consult with defendant John Welch, the school principal.

Having no personal knowledge of the events described in the Red Tide article, Welch and Gansz undertook an investigation to determine the truth of the assertion that Hobbs, the Locke principal, had lied. Upon advice of the county counsel, Welch attempted to contact Hobbs, but without success, and therefore spoke with Caras, the assistant principal. Caras stated that the charges in the article were inaccurate. Welch thereupon informed plaintiff and her companions that he would have to postpone until the following Monday, June 3, any decision as to the distribution of the Red Tide.

On Monday, Welch reached Hobbs by telephone. The latter, who in the meantime had read the article in question, acknowledged that he had made the statements attributed to him but denied that they were untrue. Eventually on the advice of both the county counsel's office and the legal adviser's office, and on the basis of his discussions with Caras and Hobbs, Welch decided not to allow distribution of the Red Tide on the campus. Nevertheless he later permitted the distribution of a flyer protesting his decision and a noon protest meeting.

---

the procedures to be followed thereunder on that campus by circulars, such as the following:

"UNIVERSITY HIGH SCHOOL

"TO:　　　STUDENTS
"FROM:　　John Welch, Principal
"SUBJECT:　DISTRIBUTION OF 'NON SCHOOL LITERATURE'

"The rules at University High School regarding distribution of 'Non-School Literature' are based on the STUDENT RIGHTS AND RESPONSIBILITIES HANDBOOK (1972) page 6.

"A student wishing to distribute 'Non-School Literature' must attach an informational copy of the literature to this form and give them to the principal or his secretary 24 hours in advance of desired distribution time. Within 24 hours the principal will respond to your request, and return this sheet to you. It is necessary to have this signed sheet before distribution is made. Permission to distribute this material does not imply approval of contents by either the Board of Education or the administration of University High School. . . ."

The circular further stated that the distribution of the printed material, if permitted, was subject to limitations in respect to time, place and manner of distribution.

[3]"Also during the course of this meeting, Hobbs stated a number of lies (1) that the no hats in class rule was made both by students and teachers, and not by him, (2) that the hats question is neither a frequent or heated subject of debate in faculty meetings and in fact the faculty is generally in support of the no hats rule, (3) that the student council has never made any attempt to change this rule, and (4) that the faculty and students are generally in support of this rule."

Plaintiff commenced the instant action on June 5, 1974. Her first amended complaint (hereafter complaint), in two counts, sought injunctive and declarative relief on the ground that the rules and regulations of defendant district, on their face and as applied, constitute an illegal prior censorship scheme, are violative of section 10611, and alternatively are violative of the First Amendment to the United States Constitution and article I, section 2 of the California Constitution, and are also violative of the equal protection and due process clauses of the federal and state Constitutions. The first count sought relief for the banning of distribution of the newspaper for the alleged reason that it contained libelous material; the second count sought relief for the flat ban on the sale of underground newspapers. The parties stipulated in open court that the hearing on the preliminary injunction should be the plenary trial, decision to be made on the basis of the verified pleadings, declarations, affidavits and exhibits. No oral testimony was received and no findings of fact and conclusions of law were made. The trial court denied the preliminary injunction, discharged the order to show cause, and denied declaratory relief and damages. Judgment was entered accordingly. This appeal by plaintiff followed.

I

In *Tinker* v. *Des Moines School Dist.* (1968) 393 U.S. 503 [21 L.Ed.2d 731, 89 S.Ct. 733], the United States Supreme Court, in a landmark decision, gave emphatic recognition to the exercise by students of the right of freedom of speech within a public school environment. "First Amendment rights, applied in the light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." (*Id.* at p. 506 [21 L.Ed.2d at p. 737].) However, these rights of students must be balanced against the rights—indeed the obligations—of school authorities to administer the school and discipline the students. Thus the high court continued: "On the other hand, the Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." (*Id.* at p. 507 [21 L.Ed.2d at p. 738].) *Tinker* then resolved the conflict between these competing rights, declaring that the student may exercise his right to freedom of expression unless the "conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others . . . ." (*Id.* at p. 513 [21

L.Ed.2d at p. 741].) Any regulation prohibiting student expression "would violate the constitutional rights of students, at least if it could not be justified by a showing that the students' activities would materially and substantially disrupt the work and discipline of the school." (*Id.* at p. 513 [21 L.Ed.2d at p. 742].)

*Tinker* in boldly proclaiming students' freedom of speech in the school environment introduced a significant change in the control of students by school authorities and in a real sense gave voice to a different theory of education. The older and, until *Tinker,* the prevailing view regarded the school administration's authority as nearly absolute. For example, in 1913, a California high school student, during school hours, delivered an address to the student body in which he denounced the board of education for maintaining the school buildings as firetraps and belittled it for doing nothing to improve the safety of the school. He was expelled from school. The court in upholding the expulsion declared: "The admitted purpose of the plaintiff's address was to belittle the defendants in their official capacity; and the whole tenor of the address was well calculated to produce not only that result, but to engender as well in the minds of the students a feeling of disrespect for the defendants, and a secret if not an open hostility to their control of the student body and management of school affairs. Such being the natural tenor and tendency of the plaintiff's address, his conduct in making the same cannot be classed as anything but a species of insubordination to constituted authority, which required correction at the hands of the defendants in order that the discipline of the school might be maintained unimpaired by anything that was said and done by the plaintiff." (*Wooster* v. *Sunderland* (1915) 27 Cal.App. 51, 55-56 [148 P. 959].)

By way of contrast, the court in *Tinker* specifically recognized that "personal intercommunication among the students . . . is not only an inevitable part of the process of attending school; it is also an important part of the educational process." (393 U.S. at p. 512 [21 L.Ed.2d at p. 741].) Moreover, this student communication, especially the expression of an unpopular view, may cause trouble and lead to disturbance, but "our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society." (*Id.* at pp. 508-509 [21 L.Ed.2d at p. 739].)

In today's world, student criticism of government, society and the school system itself constantly seeks expression in a variety of ways. One medium of this expression is the so-called "underground newspaper" produced by students off campus without the authorization of school officials, but distributed on the school premises. Newspapers of this genre typically contain material which criticizes the school administration, challenges the principles and policies of public school education and covers controversial topics outside the curriculum—all frequently couched in strident and blunt, even earthy language. (See Letwin, *Regulation of Underground Newspapers on Public School Campuses in California* (1974-1975) 22 U.C.L.A.L.Rev. 141, 142-143.) The attempted distribution of these newspapers on high school campuses and the restriction of their distribution by school authorities have spawned a substantial amount of litigation in the federal courts. (See, for example, *Jacobs* v. *Board of School Commissioners* (7th Cir. 1973) 490 F.2d 601, vac. and dism. (1975) 420 U.S. 128 [43 L.Ed.2d 74, 95 S.Ct. 848]; *Baughman* v. *Freienmuth* (4th Cir. 1973) 478 F.2d 1345; *Fujishima* v. *Board of Education* (7th Cir. 1972) 460 F.2d 1355; *Eisner* v. *Stamford Board of Education* (2d Cir. 1971) 440 F.2d 803; *Quarterman* v. *Byrd* (4th Cir. 1971) 453 F.2d 54.)[4]

Federal litigation has played no small part in the evolution of California law on the subject. In 1970 a three-judge court in the Northern District of California (*Rowe* v. *Campbell Union High School District,* No. 51060 (N.D. Cal. 1970) unreported opn., Sept. 4, 1970 (*Rowe I*)) confronted with a challenge to former sections 9012 and 9013 which had banned partisan and propaganda publications from school campuses,[5] held such sections void for vagueness and unconstitutionally

---

[4]In the case at bench, the issue of the "Red Tide" here in dispute appears to conform to this pattern. In addition to the column attacking the principal of Locke High School, it contains articles discussing the right of pregnant minors to obtain abortions without prior consent, describing as a myth the portrayal in textbooks of Abraham Lincoln as a hero, and examining the relationship between the family of Patricia Hearst and the Symbionese Liberation Army. We of course intimate no views on any of these articles.

[5]Former section 9012 provided: "Except with respect to junior colleges, no publication of a sectarian, partisan, or denominational character, shall be distributed, displayed, or used for sectarian, partisan, or denominational purposes on school premises, but such publications may be used in school library collections and for legitimate instructional purposes.

"Publications of a sectarian, partisan, or denominational character may be issued and distributed for sectarian, partisan, or denominational purposes on the grounds and premises of a junior college; provided, that such activity is carried on in a manner which does not impede the orderly conduct of school classes and programs, and shall be subject to rules and regulations of the governing board. Such rules and regulations shall include

overbroad in the light of *Tinker* and the federal cases applying *Tinker* to restrictions on the distribution of underground newspapers. Apparently in response to the *Rowe* decision, the California Legislature in 1971 repealed sections 9012 and 9013 which had banned certain publications from school campuses (see fn. 5, *ante*), and enacted section 10611. Undoubtedly aware of *Tinker's* strong endorsement of the exercise by public school students of their rights to freedom of speech and expression on the school campus, the Legislature itself proclaimed such rights for California students in section 10611. This right of expression, oral and written, is subject to reasonable time, place and manner regulations but does not extend to certain prohibited expression, namely that "which is obscene, libelous or slanderous according to current legal standards, or which so incites students as to create a clear and present danger of the commission of unlawful acts on school premises or the violation of lawful school regulations or the substantial disruption of the orderly operation of the school . . . ." (See fn. 1, *ante*.) Section 10611 directs each governing board of a school district to adopt rules and regulations concerning the exercise of the right of free expression by students upon school premises. Pursuant to this authorization defendants promulgated the rules presently under attack (see fn. 2, *ante*), which

a provision specifying that no publication which advocates the commission of an unlawful act may be issued or distributed under this section. . . ."

Former section 9013 provided: "No bulletin, circular, publication, or article of any character, whose purpose is to spread propaganda, shall be distributed or displayed to anyone, or suffered to be distributed or displayed to anyone, for propaganda purposes on the school premises during school hours or within one hour before the time of opening or within one hour after the time of closing of the school, but such bulletin, circular, publication, or article may be used in school library collections and for legitimate instructional purposes.

"During school hours or within one hour before the time of opening or within one hour after the time of closing of the school, no bulletin, circular, publication, or article of any character, the purpose of which is to foster membership in or subscriptions to the funds of any organization not directly under the control of the school authorities, shall be distributed or displayed to anyone or suffered to be distributed or displayed to anyone on the school premises unless the organization is a nonpartisan organization, the purpose of such distribution or display is a nonpartisan purpose, and such distribution or display has been approved by the state board, or by the county board of education, or by the governing board of the school district in which the school is located.

"The prohibition of this section shall not apply to bulletins or circulars concerning the meetings of organizations issued by any parent-teacher association or by any organization of parents formed for the purpose of cooperating with the school authorities in improving school conditions in the district.

"The prohibitions of this section shall not apply with respect to junior colleges; provided, that any such otherwise prohibited activity is carried on in a manner which does not impede the orderly conduct of school classes and programs, and such activities shall be subject to rules and regulations of the governing board. Such rules and regulations shall include a provision specifying that no material which advocates the commission of an unlawful act may be issued or distributed under this section."

authorize the principal to bar the distribution of a newspaper on campus by students if in his opinion it contains forbidden material as described above.

 Plaintiff contends that the prior restraint inherent in these regulations is contrary to the requirements of section 10611 and that therefore the regulations are void as being violative of an act of the Legislature. (*Morris* v. *Williams* (1967) 67 Cal.2d 733, 737, 748-749 [63 Cal.Rptr. 689, 433 P.2d 697]; see also *California Welfare Rights Organization* v. *Carleson* (1971) 4 Cal.3d 445, 455 [93 Cal.Rptr. 758, 482 P.2d 670].) We said in *Morris*: "Administrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to strike down such regulations. [Citations.]" (*Id.* at p. 748.) Plaintiff argues that when section 10611 is examined in the light of its legislative history, it may be fairly and reasonably construed as not authorizing prior restraint so that the section of its own force invalidates defendants' scheme of prior censorship. We think that the argument has merit.

To determine this central issue as to whether the District's regulations are violative of the relevant statute, we start with the genesis of section 10611. The parties before us agree that the two decisions by a three-judge federal court in *Rowe* v. *Campbell Union High School District, supra,* unreported opinions filed September 4, 1970, and February 4, 1971 (*Rowe I* and *Rowe II* hereafter),[6] formed the basis for the enactment of section 10611. Indeed it would appear that the very language of the statute was largely derived from the words of the *Rowe* court. The parties disagree, however, in their interpretation of the above opinions.

In *Rowe I* the court struck down sections 9012 and 9013 as void for vagueness and unconstitutionally overbroad and thus restrictive of the First Amendment rights of public school students upheld in *Tinker*. The *Rowe* court retained continuing jurisdiction over the matter and opined that "a system of prior review may be constitutionally permissible in the secondary school setting." The school district involved in *Rowe* responded to this invitation with alacrity and proposed a set of prior restraint censorship rules for the court's approval. In its second unreported opinion, filed on February 4, 1971 (*Rowe II*), the court rejected the proposed system of prior restraint as "too encompassing and potentially

---

[6]Both opinions in *Rowe* were made part of the proceedings in the trial court and have been incorporated in the clerk's transcript on this appeal.

devastating to withstand constitutional scrutiny." The court went on to say: "It may be that no system of prior restraint in the area of student publications can be devised which imposes a restraint sufficiently short-lived and procedurally protected to be constitutional. What may well be best—although perhaps not constitutionally compelled—is a *simple prohibition against the distribution of certain categories of material.* This could be coupled with the prior submission of the material to school authorities for informational purposes only, and with reasonable time, place and manner regulations. This straightforward system would allow the unfettered distribution of student publications except in those instances where the content of the material is outside the protections of the First Amendment. In such an instance, the school authorities could prevent distribution by prior court order." (Italics added.) The court concluded by inviting the State Board of Education to promulgate statewide guidelines in this area.

On March 11, 1971, the State Superintendent of Public Instruction presented a proposed draft of statewide guidelines to a committee of the State Board of Education, which recommended that the guidelines be submitted to the *Rowe* court for approval. On June 23, 1971, following a hearing, the court approved the guidelines as amended pursuant to the court's findings and recommendations. On September 24, 1971, when the enactment of section 10611 (Sen. Bill No. 890) was imminent, the State Superintendent of Public Instruction in a memorandum to the State Board of Education urging adoption of the guidelines, stated that they "would indicate to [local school] districts the limits of their authority [pursuant to Senate Bill No. 890], to the extent that overly restrictive regulations, if tested in court, would fail. . . . The guidelines presented to the Board will help the schools to comply with the mandates of Senate Bill 890." On October 15, 1971, the State Board of Education adopted the guidelines by a resolution uncompromisingly indicating that the authority of the school districts stopped short of any form of prior restraint: "Schools should encourage students to express opinion, to take stands, to support causes, and to present ideas. Students should realize that such rights are subject to reasonable time, place and manner restrictions and to certain prohibitions. There should be no prior censorship or requirements of approval of the contents or wording of the printed materials related to student expression on campus."

Meanwhile in April 1971, after the two *Rowe* opinions and after the first proposed draft of the guidelines had been submitted to the State

Board of Education, section 10611 had been introduced in the Legislature as Senate Bill No. 890. The bill first conferred upon public school students a broad right of freedom of expression on the school campuses, including speech, oral and written, and conduct. Insofar as the bill restricted this right of free expression it followed the suggestion by the *Rowe* court to a remarkable degree: it contained a simple prohibition against the distribution of certain categories of material, made no specific provision for any system of prior restraint, and authorized the enactment of reasonable time, place and manner regulations. To an even more remarkable degree the language of Senate Bill No. 890 paralleled the guidelines drawn up by the State Superintendent of Public Instruction.[7] As indicated above, the guidelines specifically excluded any form of prior restraint.

[7] By way of illustration and for comparison with the language of the statute (see fn. 1, *ante*), we set forth the following pertinent parts of the guidelines:

"GUIDELINES FOR STUDENT EXPRESSION ON CAMPUS:

"The 18 year old has recently been granted the right to vote in national, state and local elections.

"The preparation of the newly enfranchised youth to exercise their rights and duties as citizens in a democratic society includes the inter-communication of ideas, and the need for a forum to express such ideas.

"This process of inquiry includes an expansion of student rights regarding circulation of petitions, circulars, newspapers, and other printed matter, the use of bulletin boards, and the wearing of insignia.

"Schools should encourage students to express opinions, to take stands, to support causes, and to present ideas. Students should realize that such rights are subject to reasonable time, place, and manner restrictions and to certain prohibitions. There should be no prior censorship or requirements of approval of the contents or wording of the printed materials related to student expression on campus.

"The following guidelines are intended to aid each school or school district in drafting its own set of guidelines for student expression on the campus of the school wherein the students attend as pupils in the California public school system. The guidelines are not intended for the control of persons who are not students of the school wherein such guidelines are implemented.

"CIRCULATION OF PETITIONS, CIRCULARS, NEWSPAPERS
AND OTHER PRINTED MATTER

"Students should be allowed to distribute petitions, circulars, leaflets, newspapers, and other printed matter. . . .

" . . . . . . . . . . . . . . . . .

"BUTTON, BADGES, AND OTHER INSIGNIA OF
SYMBOLIC EXPRESSION

" . . . . . . . . . . . . . . . . .

"PROHIBITED MATERIAL

"1. Material which is obscene to minors according to current legal definitions.

"2. Material which is libelous according to current legal definitions.

"3. Material which incites students so as to create a clear and present danger of the imminent commission of unlawful acts or of the substantial disruption of the orderly operation of the school.

"4. Material which expresses or advocates racial, ethnic, or religious prejudice so as to create a clear and present danger of imminent commission of unlawful acts or of the

It is therefore opportune at this point to set forth the sharply divergent positions of the parties with respect to the meaning of section 10611. Plaintiff argues that a consideration of the historical background of the statute, which we have just detailed, together with its declared objective, compels the conclusion that the Legislature intended to reject any system of prior restraint. Since the *Rowe* court and the State Board of Education employed the word "prohibited" to mean a system rejecting prior censorship, the Legislature's use of the word in section 10611, she argues, is highly indicative of a similar intention. Moreover, plaintiff points out, there is nothing to suggest that the Legislature intended anything different.

Defendants on the other hand argue that by its use in section 10611 of the phrase "shall be prohibited" (see fn. 1, *ante*) the Legislature clearly intended that the types of expression falling within the exceptive language should not be disseminated on high school campuses. The word "prohibit," they argue, although having two meanings, should be construed here to mean "prevent." Noting that words are to be given their ordinary meaning, they insist that the ordinary and only reasonable interpretation of the phrase "shall be prohibited" is that the excepted expression by students is to be forbidden distribution altogether.

We agree with plaintiff. We observe that the word "prohibit" is defined as follows: "(1) to forbid by authority or command: . . . 2.a: to prevent from doing or accomplishing something. . . ." (Webster's Third New Internat. Dict. (1963 ed.) p. 1813.) Either of the above meanings suggests a determination that dissemination of material in the objectionable categories may be halted. Neither meaning conclusively indicates the *time* of the prohibition—that is whether the word "prohibit" means to *forbid* by terminating distribution once it has begun and imposing a sanction for such activity, or means to *prevent* distribution by precluding it beforehand. To put it another way, the word itself supports either meaning and excludes neither. However, we are of the view that the section when considered in the light of the legislative history detailed above, can be more reasonably construed as not authorizing prior restraint but rather as authorizing the stopping of such distribution once begun and the imposition of sanctions against those students responsible for such distribution. Moreover, since "[a]ny system of prior restraint . . . 'comes to this Court bearing a heavy presumption against its constitu-

---

substantial disruption of the orderly operation of the school.
"5. Material which is distributed in violation of the time, place, and manner requirements."

tional validity.' *Bantam Books, Inc.* v. *Sullivan,* 372 U.S. at 70 . . . ." (*Southeastern Promotions Ltd.* v. *Conrad* (1974) 420 U.S. 546, 558 [43 L.Ed.2d 448, 459, 95 S.Ct. 1239]; see also *Wilson* v. *Superior Court* (1975) 13 Cal.3d 652, 656-657 [119 Cal.Rptr. 468, 532 P.2d 116]) and since former sections 9012 and 9013 for which section 10611 was a replacement had just been declared unconstitutional by the *Rowe* court because they purported to permit prior restraints on the free expression of secondary school students, it is difficult to conceive that the Legislature in enacting section 10611 intended to resurrect a system of prior restraint without specifically so stating. We think this is so especially in view of the fact that the Legislature was aware of the sensitive and complicated constitutional problems in this area as evidenced by the federal court litigation dealing with attempts to control underground newspapers.

While the federal circuits which have considered the problem appear to have indicated that some system of prior restraint may be constitutional (*Jacobs* v. *Board of School Commissioners, supra,* 490 F.2d 601; *Baughman* v. *Freienmuth, supra,* 478 F.2d 1345; *Sullivan* v. *Houston Independent School District* (5th Cir. 1973) 475 F.2d 1071; *Shanley* v. *Northeast Ind. Sch. Dist., Bexar County, Tex.* (5th Cir. 1972) 462 F.2d 960; *Quarterman* v. *Byrd, supra,* 453 F.2d 54; *Eisner* v. *Stamford Board of Education, supra,* 440 F.2d 80; but see *Fujishima* v. *Board of Education, supra,* 460 F.2d 1355) none of them actually upheld a system of prior restraint. Some courts have focused upon the need for clear, precise standards of review and have found the standards proposed unacceptable (e.g., *Jacobs, Baughman,* and *Shanley*) while other courts have focused upon the need for procedural safeguards, such as prompt review within a definite time limit, as well as provision for appeal, either judicial or administrative (e.g., *Eisner, Quarterman* and *Baughman*). Since the case at bench involves the prior censorship of libelous material, we think that *Baughman* is the case most in point and most illustrative of the constitutional problems in this area.

*Baughman* dealt with a challenge to a regulation requiring students to submit any "underground" newspaper to the principal for review and authorizing the principal to bar distribution of the paper if in his opinion it contained libelous language. The court held the regulation unconstitutional on three bases: (1) that it was procedurally defective in that it failed to specify a reasonably short time for the principal's action and to provide for an expeditious review of his decision; (2) that the term "distribution" was unconstitutionally vague, stating that "there may be

no prior restraint unless there is 'a *substantial* distribution' " (*Baughman, supra,* at p. 1349); and (3) that "[t]he use of terms of art such as 'libelous' and 'obscene' are not sufficiently precise and understandable by high school students and administrators untutored in the law to be acceptable criteria [in the context of prior restraint]. . . . Thus, while school authorities may ban obscenity and unprivileged libelous material there is an intolerable danger, in the context of prior restraint, that under the guise of such vague labels they may unconstitutionally choke off criticism, either of themselves, or of school policies, which they find disrespectful, tasteless, or offensive." (*Id.* at pp. 1350-1351.)

■ Mindful of this historical background of section 10611, we do not believe that the Legislature intended this statute to confer upon local school districts *carte blanche* to enact regulations embodying constitutionally suspect prior restraint systems. Rather it seems to us more reasonable to conclude that the Legislature intended to establish the scheme outlined in the *Rowe II* opinion and recognized in the guidelines proposed by the State Superintendent of Public Instruction, namely a system providing for a simple prohibition against the distribution of specified categories of objectionable material. Under this system, upon noncompliance with the regulation, school authorities would be authorized to stop distribution of the offensive material and discipline those responsible; they would not, however, be authorized to prevent the distribution in the first place through prior administrative censorship or prior restraint of its content.

■ For the foregoing reasons, we hold that section 10611 does not authorize school districts to establish systems of prior restraint in respect to the distribution of the prohibited categories of expression delineated in the statute. We do not say that the Legislature could not constitutionally establish such a system in the public school environment. We say only that it has not done so. Therefore, under the settled principle that regulations which are violative of an act of the Legislature are void (*Morris* v. *Williams* (1967) 67 Cal.2d 733, 737, 748-749 [63 Cal.Rptr. 689, 433 P.2d 697]) we hold that the regulations of defendant Los Angeles Unified School District here under review (see fn. 2, *ante*) insofar as they purport to authorize prior censorship of the contents of student publications, are invalid. We emphasize, however, that our holding does not leave school authorities without adequate sanctions, since of course they retain their power to discipline students who attempt to distribute prohibited material.

## II

In the second count of her complaint, plaintiff attacks the constitutionality and the legislative authority for the flat ban on the *sale* of newspapers on her high school campus, even if their distribution without charge should be permitted. Administrative Regulation 1276-1 of the Los Angeles School Board purports to ban the sale of publications as a regulation governing the manner of distribution: "1276-1. . . . a. Circulation of Petitions, Circulars, Newspapers, and Other Printed Matter. Students should be allowed to distribute petitions, circulars, leaflets, newspapers, and other printed matter subject to the following limitations: . . . 3. Manner. The manner of distribution be such that: . . . (b) Funds or donations are not collected for the material distributed,"[8] apparently invoking the power conferred by section 10611 on school districts to make "reasonable provisions for the time, place, and manner of conducting such activities." However, section 10611, which grants students the right to exercise free expression on school premises, with the exception of certain unprotected speech does not in itself prohibit the *sale* of printed materials. Indeed the section expressly confers the right of "distribution of printed materials." (§ 10611—see fn. 1, *ante.*) There is nothing in the statute which suggests that the word "distribution" is to be limited to distribution without charge or without seeking donations for the distribution.

While it may be possible to construe the Legislature's grant of power to school districts to regulate the manner of the distribution of printed materials on school premises as including the right to ban distribution by sale, it is at best a strained reading. Moreover, former section 9013, which was declared unconstitutional by the *Rowe* court and which section 10611 replaced, banned "subscriptions to the funds of any organization not directly under the control of school authorities." (See fn. 5, *ante.*) Section 10611 did not reenact any portion of the ban on the sale of, or the subscription to, the printed materials which it declared students had the right to distribute on school premises.

Finally to construe section 10611 as empowering school districts to flatly ban the sale of printed materials on school premises would again raise serious constitutional questions. Those courts which have considered regulations flatly banning the sale of underground newspapers,

---

[8] This language appears among certain "time, place and manner" limitations prescribed for the circulation of petitions and other printed matter. It therefore follows the second paragraph of Regulation 1276-1 quoted in footnote 2, *ante.*

have uniformly held them to be unconstitutionally overbroad restrictions on the freedom of speech of the students. (*Jacobs* v. *Board of School Commissioners, supra,* 490 F.2d 601, 607-609, vacated on grounds of mootness (1975) 420 U.S. 128 [43 L.Ed.2d 74, 95 S.Ct. 848]; *Peterson* v. *Board of Education.* (D.Neb. 1973) 370 F.Supp. 1208.) ■ California has long recognized the United States Supreme Court doctrine that the right to free speech protects not only the content but the dissemination and circulation of the material as well. (*Dulaney* v. *Municipal Court* (1974) 11 Cal.3d 77, 83 [112 Cal.Rptr. 777, 520 P.2d 1]; *Van Nuys Pub. Co.* v. *City of Thousand Oaks* (1971) 5 Cal.3d 817, 821 [97 Cal.Rptr. 777, 489 P.2d 809]; *Wollam* v. *City of Palm Springs* (1963) 59 Cal.2d 276, 284-285 [29 Cal.Rptr. 1, 379 P.2d 481]; *California Newspaper Publishers Assn., Inc.* v. *City of Burbank* (1975) 51 Cal.App.3d 50, 53 [123 Cal.Rptr. 880].) The right to publish a newspaper would be meaningless indeed if it did not include the right to sell it. We are of the view that, as indicated by the court in *Jacobs,* the school's legitimate interest in maintaining good order and an educational atmosphere can be adequately promoted by reasonable time, place and manner regulations, but that a flat ban on sale is unconstitutionally overbroad. Given reasonable time, place and manner regulations as to distribution of printed matter, we fail to see how the *sale* of newspapers on the school premises will necessarily disrupt the work and discipline of the school, whereas their distribution free of charge will not.

It is true as urged by defendants that the school is not a marketplace and that school officials have authority to control commercial conduct on school premises. Section 9021 bars solicitation of students, by teachers or others to "subscribe or contribute to the funds of, to become members of, or to work for, any organization not directly under the control of the school authorities" with the exception of certain charities. However, the section continues: "Nothing in this section shall be construed as prohibiting the solicitation of pupils of the public school on school premises by pupils of that school for any otherwise lawful purpose." It seems incontestable that the sale of a student newspaper is a lawful purpose.

■ We therefore hold that section 10611 does not authorize school districts to ban the sale of printed materials by students which are otherwise entitled to be distributed and that the regulations of defendant school district to that extent are invalid as violative of the statutory

authority. (*In re Jordan,* 7 Cal.3d 930, 939 [103 Cal.Rptr. 849, 500 P.2d 873]; *Morris* v. *Williams, supra,* 67 Cal.2d 733, 737, 748-749.)

In view of our foregoing conclusions, we deem it unnecessary to consider the other contentions raised by plaintiff.

The judgment is reversed and the cause is remanded to the trial court for further proceedings in conformity with the views herein expressed.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Clark, J., and Richardson, J., concurred.

Respondents' petition for a rehearing was denied January 5, 1977.