[No. A112083. First Dist., Div. Five. May 21, 2007.]

ANDREW D. SMITH et al., Plaintiffs and Appellants, v. NOVATO UNIFIED SCHOOL DISTRICT et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts V., VI., and VII.

1440

[black redaction bars]

**COUNSEL**

Pacific Legal Foundation, Sharon L. Browne, Paul J. Beard II, Arthur B. Mark III, Damien M. Schiff and Scott A. Sommerdorf for Plaintiffs and Appellants.

Caldwell, Leslie, Newcombe & Pettit, Linda M. Burrow, Stephanie S. Christensen; Christine P. Sun and Peter Eliasberg for ACLU Foundation of Southern California and the Student Press Law Center as Amici Curiae on behalf of Plaintiffs and Appellants.

Law Offices of Dennis J. Walsh, Dennis J. Walsh and Stephan Birgel for Defendants and Respondents.

**OPINION**

**GEMELLO, J.**—The principal issue presented in this appeal is whether defendant Novato Unified School District (District) violated Education Code section 48907,[1] which guarantees student free speech rights in public high schools.

The trial court granted judgment for defendants, concluding that a student opinion editorial entitled *Immigration*, was not protected speech under section 48907 because it constituted "fighting words," and that there was no infringement of the student's free speech rights because the opinion editorial was published.

We reverse, holding that *Immigration* was not speech likely to incite disruption within the meaning of section 48907 and that the District infringed plaintiff's rights by stating that the publication of *Immigration* violated the District speech policies. In the unpublished part of the decision we conclude that the District did not infringe plaintiff's rights vis-à-vis his opinion

---

[1] All further statutory references are to the Education Code unless otherwise indicated.

editorial *Reverse Racism*, the individual defendants are not immune from liability, the District speech policies are consistent with section 48907, and the District Mission Statement is a general declaration of philosophical goals rather than an enforceable speech regulation.[2]

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Andrew D. Smith (Smith) was enrolled at Novato High School, a public school in defendant District from 1998 to 2002. Plaintiff Dale R. Smith, Andrew's father, is a taxpayer in the City of Novato and resides within the District's boundaries.

During the 2001–2002 school year, Smith was a senior at Novato High School, enrolled in a journalism class taught by Jennifer Leib. As part of the class, the students published a newspaper called The Buzz. The class elected Smith "Opinions Editor" for the first issue of The Buzz. Smith wrote an opinion editorial on illegal immigration entitled *Immigration*. It included the following statements, which were the focus of the District and the trial court:

—"I'll even bet that if I took a stroll through the Canal district in San Rafael that I would find a lot of people that would answer a question of mine with 'que?', meaning that they don't speak English and don't know what the heck I'm talking about."

—"Seems to me that the only reason why they can't speak English is because they are illegal."

—"40% of all immigrants in America live in California . . . because Mexico is right across the border, comprende?"

—"[I]f they can't legally work, they have to make money illegal way [*sic*]. This might include drug dealing, robbery, or even welfare. Others prefer to work with manual labor while being paid under the table tax free."

—"If a person looks suspicious then just stop them and ask a few questions, and if they answer 'que?', detain them and see if they are legal."

—"Others seem to think that there should be a huge wall along the Mexican/U.S. border."

—"Criminals usually flee here in order to escape their punishment."

[2] In a separate decision in appeal No. A111219 (*Smith v. Novato Unified School Dist.* (May 21, 2007) [nonpub. opn.]), we reverse the award of costs in favor of the District.

Before publication, defendant Lisa Schwartz, acting principal of Novato High School (Principal), reviewed The Buzz for spelling and grammar, and for violations of the District's speech policies, Board Policy 5145.2 and Administrative Regulation 5145.2. In relevant part, Board Policy 5145.2 prohibits "any expression or materials . . . that create a clear and present danger that students will be incited to commit unlawful acts on school premises, to violate school rules, or to substantially disrupt the orderly operation of the school (EC 48907)."

*Immigration* was published in The Buzz and distributed at the high school during the morning of November 13, 2001. The Principal did not receive any complaints about the opinion editorial that day. However, the next day the Principal was approached by four or five Latino parents, who were upset and wanted to talk to her about *Immigration*. The Principal met with the parents for about an hour. Two vice-principals and a counselor then told her that some students were upset by the opinion editorial and were "out of class." When the school counselor opined that the students needed to talk about their feelings, the Principal decided to meet with all of the students who had left class. The parents on campus also joined the assembly.

Before the meeting, the Principal called defendant John Bernard, the District superintendent (Superintendent), to tell him what was happening on campus. Without reading *Immigration*, the Superintendent immediately instructed her to retract any remaining copies of The Buzz. The Principal directed the journalism teacher to collect the remaining copies of the newspaper.[3]

The Principal then met with the parents and students. Counselors brought in large sheets of paper so students could express their thoughts in writing. Students expressed their anger over the content of *Immigration*. Some students were crying. The Principal apologized to the students and parents for "misinterpretation and misapplication of" board policy in the publication of *Immigration*.[4] She warned that the school was not going to tolerate any violence or threats of violence against the author. The Superintendent and eight to 10 teachers joined the meeting. At its highpoint during the lunch hour, about 100 to 150 students were in the lecture hall.

---

[3] The trial court found that there were no undistributed copies of the newspaper to be collected. Plaintiffs do not challenge that factual finding on appeal.

[4] The Principal also testified that she stated that "the reason that the article was published was because the student had a right to free speech, in my judgment, at that time . . . ." It appears that the Principal was referring to her prepublication conclusion that *Immigration* was within the scope of Smith's right to free speech. After publication, the Principal and the District apologized for that "misinterpretation and misapplication of" board policy.

That same day the Principal and Superintendent prepared a letter to parents to be sent home with all students. The letter stated: "Yesterday the November issue of our school's student newspaper, *The NHS Buzz*, was distributed. This issue included an opinion article representing the beliefs of one student that negatively presented immigrants in general and Hispanics in particular. We are writing to express our deepest regrets for the hurt and anger this article has generated for both students and their parents. [¶] This article should not have been printed in our student newspaper, as it violates our District's Board Policy regarding student publications, which states, in part, 'Students' rights of expression shall be limited only as allowed by law in order to maintain an orderly school environment and to protect the rights, health, and safety of all members of the school community.' [¶] In addition, our district has a Human Relations and Respect Mission Statement that states: In order to create and sustain a safe, just and respectful learning environment in the Novato Unified School District, all individuals including students, staff, parents and community members shall be treated with dignity, respect and fairness. [¶] Earlier today we met informally with approximately 150 students and parents to discuss this issue and answer their questions. To provide a forum for the families who were not on campus today, we have scheduled a meeting tomorrow . . . in the Lecture Hall. [¶] In addition, we are meeting this afternoon with the faculty to review Board Policy and the Human Relations and Respect Mission Statement, which will be reviewed with students in class tomorrow."

Subsequently, the District instructed the teachers to review the speech policy and Mission Statement in class. The District also conducted a second meeting about *Immigration* the evening of November 15. Approximately 200 people attended. Students, parents, and staff expressed their dismay regarding *Immigration.*

On November 14, a Latino student threatened to "kick [Andrew's] ass" for writing *Immigration.* At the end of the month, Smith suffered a chipped tooth in an altercation with another Latino student. That same student subsequently threatened to kill Smith. The Principal was concerned about Smith's safety and asked him to report any threats or violence.

On December 4, 2001, the District Board of Trustees held a public meeting. The Principal reported on the events surrounding *Immigration.* She stated that she had misinterpreted Board policy in allowing *Immigration* to be published because Board policy allows student "rights of expression" to be limited "as allowed . . . by law in order to maintain an orderly school environment and to protect the rights, health, and safety of all members of the school community." She further stated that she had "retracted the remaining copies of the paper" including *Immigration.* Many students and parents spoke at the meeting, including Smith and his father.

In January 2002, issue two of The Buzz was published; Smith did not write anything for that issue. In late January or early February 2002, Smith submitted a second opinion editorial, entitled *Reverse Racism*. The piece contained many provocative statements about race relations. For example, Smith reflected on the limited police and media reaction following an incident where a group of "minorit[ies]" beat him up, stating "Think of it, a group of 20 drunken males beating up one black kid. I would bet my life that the police or even the media would have handled it differently." He also asserted that O.J. Simpson would have been convicted if he had been White; expressed confusion about the "politically correct" names used to refer to "minorities;" and complained about "special privileges," "reverse discrimination," and "affirmative action."

The student editor-in-chief and the journalism teacher approved the piece for publication and included it in a draft layout for review by the Principal. The Principal sent a copy of *Reverse Racism* to the ACLU (American Civil Liberties Union), which opined that it was protected speech. Again, the Principal had concerns about the piece, but she approved it for publication. In light of the disruption that followed publication of *Immigration*, the Principal thought it would be a good idea to publish a counterviewpoint along with *Reverse Racism*; the Superintendent agreed. The Principal met with the journalism students to encourage them "to create a product that was balanced and fair and top quality." One of the strategies discussed was publishing a counterviewpoint to Smith's opinion editorial. She did not require them to publish a counterviewpoint. Because there was insufficient time for someone to write a counterviewpoint before publication of the February 2002 issue of The Buzz, the students voted to move *Reverse Racism* to the next issue of the paper.

In the interim, *Reverse Racism* was published in the Novato Advance, a local newspaper not affiliated with the District. The newspaper reported that the opinion piece had been "removed" from The Buzz.

*Reverse Racism* was published in the May 2002 edition of The Buzz. There was also a counterviewpoint entitled *It's About Time* and another opinion editorial by Smith entitled *Embrace Diversity?*

On May 2, 2002, plaintiffs filed the present action. In September, plaintiffs filed an amended complaint. The complaint alleged violations of Smith's right to free speech under the United States and California Constitutions and the California Education Code and challenged the District's speech policies as facially invalid. Plaintiffs sought an injunction prohibiting further illegal infringement of speech and nominal damages of $1.00. Following a bench trial, the court found in favor of the District and the individual defendants on all causes of action. The judgment included an award of costs to the District.

We granted the request of the ACLU Foundation of Southern California and the Student Press Law Center to file an amicus curiae brief in support of plaintiffs.

DISCUSSION

### I. Summary of Relevant State and Federal Law

■ The First Amendment of the United States Constitution provides in part: "Congress shall make no law . . . abridging the freedom of speech . . . ." Article I, section 2, subdivision (a) of the California Constitution guarantees that "[e]very person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." The purpose of both provisions is "to abolish governmental censorship and to constitutionalize society's substantial interest in protecting the right to comment on issues of public concern." (*Lopez v. Tulare Joint Union High School Dist.* (1995) 34 Cal.App.4th 1302, 1309–1310 [40 Cal.Rptr.2d 762] (*Lopez*).)

■ Although the constitutional provisions do not expressly exclude students, students' free speech rights lacked judicial recognition until the landmark United States Supreme Court ruling *Tinker v. Des Moines School Dist.* (1969) 393 U.S. 503 [21 L.Ed.2d 731, 89 S.Ct. 733] (*Tinker*). Previously, "it was generally accepted that school officials stood in the stead of parents, i.e., in loco parentis, and had parent-like authority to control student conduct and expression." (*Lopez, supra,* 34 Cal.App.4th at p. 1310.) *Tinker* recognized the authority of public school officials to control student conduct but concluded that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." (*Tinker*, at p. 506.) *Tinker* held that a student may exercise the right to freedom of expression unless the "conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others . . . ." (*Id.* at p. 513.) Any regulation prohibiting student expression "would violate the constitutional rights of students, at least if it could not be justified by a showing that the students' activities would materially and substantially disrupt the work and discipline of the school." (*Ibid.*) Although students' First Amendment rights had to be "applied in light of the special characteristics of the school environment," students could not be "confined to the expression of those sentiments that are officially approved." (*Tinker*, at pp. 506, 511; see also *Bright v. Los Angeles Unified Sch. Dist.* (1976) 18 Cal.3d 450, 455–460 [134 Cal.Rptr. 639, 556 P.2d 1090] (*Bright*) [discussing *Tinker*].)

■ Applying *Tinker, supra,* 393 U.S. 503, a California federal district court found unconstitutional sections 9012 and 9013 of California's Education Code, which banned "partisan" and "propaganda" publications on high school campuses. (*Bright, supra,* 18 Cal.3d at pp. 457–458.) The California Legislature responded in 1971 by repealing sections 9012 and 9013 and enacting section 10611, "the nation's first statutory scheme for protecting students' free expression on school campuses." (*Lopez, supra,* 34 Cal.App.4th at p. 1311; see also *Bright,* at p. 458.) In 1978, the Legislature replaced section 10611 with section 48907, which specifically protects student expression in official school publications. (*Lopez,* at p. 1312.)

Section 48907 provides: "Students of the public schools shall have the right to exercise freedom of speech and of the press including, but not limited to, the use of bulletin boards, the distribution of printed materials or petitions, the wearing of buttons, badges, and other insignia, and the right of expression in official publications, whether or not such publications or other means of expression are supported financially by the school or by use of school facilities, except that expression shall be prohibited which is obscene, libelous, or slanderous. Also prohibited shall be material which so incites students as to create a clear and present danger of the commission of unlawful acts on school premises or the violation of lawful school regulations, or the substantial disruption of the orderly operation of the school. [¶] Each governing board of a school district and each county board of education shall adopt rules and regulations in the form of a written publications code, which shall include reasonable provisions for the time, place, and manner of conducting such activities within its respective jurisdiction. [¶] Student editors of official school publications shall be responsible for assigning and editing the news, editorial, and feature content of their publications subject to the limitations of this section. However, it shall be the responsibility of a journalism adviser or advisers of student publications within each school to supervise the production of the student staff, to maintain professional standards of English and journalism, and to maintain the provisions of this section. [¶] There shall be no prior restraint of material prepared for official school publications except insofar as it violates this section. School officials shall have the burden of showing justification without undue delay prior to any limitation of student expression under this section. [¶] 'Official school publications' refers to material produced by students in the journalism, newspaper, yearbook, or writing classes and distributed to the student body either free or for a fee. [¶] Nothing in this section shall prohibit or prevent any governing board of a school district from adopting otherwise valid rules and regulations relating to oral communication by students upon the premises of each school."

■ After reviewing the history of the enactment of section 48907, the *Lopez* court concluded that the statute "constitutes a statutory embodiment of the *Tinker* and related First Amendment cases at that time." (*Lopez, supra,* 34 Cal.App.4th at p. 1318.)

■ Eight years after the enactment of section 48907, the United States Supreme Court held that the First Amendment did not prevent a school district from disciplining a high school student who gave a lewd speech at a school assembly. (*Bethel School Dist. No. 403 v. Fraser* (1986) 478 U.S. 675, 685 [92 L.Ed.2d 549, 106 S.Ct. 3159].) Subsequently, in *Hazelwood School District v. Kuhlmeier* (1988) 484 U.S. 260 [98 L.Ed.2d 592, 108 S.Ct. 562] (*Kuhlmeier*), the United Supreme Court held that under the First Amendment school officials retain relatively broad authority to regulate student speech in school-sponsored publications. "[A] school may in its capacity as publisher of a school newspaper or producer of a school play 'disassociate itself,' [*Bethel School Dist.,* at p. 685] . . . from speech that is, for example, ungrammatical, poorly written, inadequately researched, biased or prejudiced, vulgar or profane, or unsuitable for immature audiences." (*Kuhlmeier,* at p. 271.) In sum, "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." (*Kuhlmeier,* at p. 273.)

■ Although *Kuhlmeier, supra,* 484 U.S. 260 remains the controlling standard under the First Amendment for school-sponsored speech, California courts have held that section 48907 provides broader protection for student speech in California public school newspapers. *Leeb v. DeLong* (1988) 198 Cal.App.3d 47, 54 [243 Cal.Rptr. 494] (*Leeb*) concluded that section 48907 confers editorial control of official student publications on the student editors alone, with very limited exceptions. The court held that as a matter of California statutory law, "[t]he broad power to censor expression in school sponsored publications for pedagogical purposes recognized in *Kuhlmeier* is *not available to this state's educators.*" (*Leeb,* at p. 54, italics added; see also *Lopez, supra,* 34 Cal.App.4th at pp. 1315, 1317–1320; *McCarthy v. Fletcher* (1989) 207 Cal.App.3d 130, 146, fn. 3 [254 Cal.Rptr. 714]; *California Teachers Assn. v. Governing Board* (1996) 45 Cal.App.4th 1383, 1388, fn. 3 [53 Cal.Rptr.2d 474].)[5]

---

[5] *Leeb, supra,* 198 Cal.App.3d 47 separately considered whether the California Constitution protects student speech in school newspapers more broadly than does the United States Constitution, as interpreted by *Kuhlmeier, supra,* 484 U.S. 260. *Leeb* construed *Bailey v. Loggins* (1982) 32 Cal.3d 907 [187 Cal.Rptr. 575, 654 P.2d 758] (a prison newspaper case) as rejecting as a matter of state constitutional law the approach to government-sponsored speech later adopted by *Kuhlmeier.* (*Leeb,* at pp. 54–56; see also *Lopez, supra,* 34 Cal.App.4th at pp. 1315–1316, 1318–1320; but see *McCarthy v. Fletcher, supra,* 207 Cal.App.3d at p. 146,

We note that *Leeb, supra,* 198 Cal.App.3d at page 54, did not take into account the language in section 48907 authorizing journalism advisers "to maintain professional standards of English and journalism." Under that language, educators may well be able to exercise some of the control over student speech in school newspapers permitted under *Kuhlmeier.* (*Kuhlmeier, supra,* 484 U.S. at p. 271.) The issue was not raised by the parties and we need not decide how the authority conferred to schools under the "professional standards" language in section 48907 differs from the authority recognized in *Kuhlmeier* (see pt. III.B., *post*).

In 1992, the Legislature enacted section 48950, which provides further protections for student free speech rights. The section prohibits school districts from making or enforcing "any rule subjecting any high school pupil to disciplinary sanctions solely on the basis of conduct that is speech or other communication" that, if engaged in off campus, is protected from government restriction by the First Amendment or by article I, section 2 of the California Constitution. (§ 48950, subd. (a).) The Legislature also expressly reaffirmed section 48907, stating that nothing in section 48950 may be construed to supersede, limit or modify the provisions of section 48907. (§ 48950, subd. (e).)

Against this legal and historical backdrop, we must determine: (1) whether *Immigration* is protected speech under section 48907 and (2) if so, whether the District's response to *Immigration* infringed on Smith's exercise of his right to free speech under the statute. We then consider whether the District infringed Smith's free speech rights with respect to *Reverse Racism,* whether the individual defendants are entitled to immunity under Government Code section 820.2, and whether the District's speech policies are facially invalid.

## II. *Standard of Review*

Statutory construction is a question of law we decide de novo. (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856].) Generally, the trial court's resolution of disputed factual issues is reviewed for substantial evidence. (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 983 [64 Cal.Rptr.2d 843, 938 P.2d 903].) However, where an issue implicates the First Amendment, the trial court's resolution of "constitutionally relevant facts" is subject to independent review by this court. (See *In re George T.* (2004) 33 Cal.4th 620, 631–634 [16 Cal.Rptr.3d 61, 93 P.3d 1007].)

fn. 3 [emphasizing independent statutory ground for *Leeb* holding].) This issue is not squarely presented by the parties and we do not express any opinion on whether, in the absence of section 48907, the California Constitution would permit the restrictions on student speech permitted by *Kuhlmeier.*

The independent review standard arises from a reviewing court's obligation to make an independent examination of the whole record in order to ensure that the judgment does not constitute a forbidden intrusion on free expression. (*In re George T., supra*, 33 Cal.4th at p. 631.) "It is necessary 'because the reaches of the First Amendment are ultimately defined by facts it is held to embrace' and an appellate court must decide 'whether a given course of conduct falls on the near or far side of the line of constitutional protection.' " (*In re George T.*, at p. 632.) *In re George T.* held that the independent review standard should be employed in determining whether speech characterized by a government entity as unprotected is in fact outside the scope of the right to free speech. (*Id.* at p. 633.) Like the criminal threat statute, Penal Code section 422, at issue in *In re George T.*, section 48907 incorporates constitutional free speech standards. (*Lopez, supra*, 34 Cal.App.4th at p. 1318; see also *Bright, supra*, 18 Cal.3d at pp. 458, 463.) We independently review whether *Immigration* is protected speech under section 48907. (See *In re George T.*, at p. 634.) We independently review whether the District's response constituted infringement under section 48907 because that is another "constitutionally relevant fact[]" (*In re George T.*, at p. 634) and because, as we explain later, the Legislature incorporated constitutional standards for infringement into section 48907.

"Independent review is not the equivalent of de novo review 'in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes' the outcome should have been different. [Citation.] Because the trier of fact is in a superior position to observe the demeanor of witnesses, credibility determinations are not subject to independent review, nor are findings of fact that are not relevant to the First Amendment issue." (*In re George T., supra*, 33 Cal.4th at p. 634.) We will defer to the trial court's credibility determinations but will make an independent examination of the whole record in determining the existence of the constitutionally relevant facts.

### III. *Protected Speech Under Section 48907*

Plaintiffs contend that the District was not authorized to prohibit publication of *Immigration* under section 48907. In particular, they contend that contrary to the trial court's conclusion, the opinion editorial was not speech likely to incite disruption of the orderly operation of the high school. Resolution of this issue requires us to construe the meaning of the term "incites" as used in section 48907.

#### A. *Plain Meaning of "Incites" in Section 48907*

██ Our primary objective in interpreting a statute is to determine and give effect to the underlying legislative intent. (Code Civ. Proc., § 1859.)

" 'Our first·step . . . is to scrutinize the actual words. of the statute, giving them a plain and commonsense meaning.' " (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 633 [59 Cal.Rptr.2d 671, 927 P.2d 1175].) " '[W]e seek to give meaning to every word and phrase in the statute to accomplish a result consistent with the legislative purpose . . . .' " *(Id.* at p. 634.) "If the words of a statute are reasonably free of ambiguity and uncertainty, we look no further than those words to determine the meaning of that language." (*Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1503 [82 Cal.Rptr.2d 368], citing *Building Industry Assn. v. City of Camarillo* (1986) 41 Cal.3d 810, 819 [226 Cal.Rptr. 81, 718 P.2d 68].)

■ The statutory language of section 48907 ·critical to our review. follows: "Also prohibited shall be material which so incites students as to create a clear and present danger of the commission of unlawful acts on school premises or the violation of lawful school regulations, or the substantial disruption of the orderly operation of the school." (§ 48907.)

■ We resolve the statutory interpretation issue on the plain language alone. The Black's Law Dictionary definition of "incite" is "To arouse; urge; provoke; encourage; spur on; goad; stir up; instigate; set in motion; as, to 'incite' a riot. Also, generally, in criminal law to instigate, persuade, or move another to commit a crime; in this sense nearly synonymous with 'abet.' " (Black's Law Dict. (6th ed. 1990) p. 762, col. 2.) The definition focuses on conduct that is directed at achieving a certain result.

■ The established meaning of incite/incitement in California law is consistent with this understanding of the verb "to incite." In the criminal context the word "abets" means "to incite or encourage," as used in determining accomplice liability. (*People v. Elliott,* (1993) 14 Cal.App.4th 1633, 1641 [18 Cal.Rptr.2d 426]; see also *People v. Bishop* (1988) 202 Cal.App.3d 273, 282, fn. 6 [248 Cal.Rptr. 678] [words alone might provide basis for criminal liability "if they amount to incitement, instigation, or advisement"].) ■ The offense "incitement to riot" applies to a person who "engages in conduct that urges a riot, or urges others to commit acts of force or violence." (Pen. Code, § 404.6, subd. (a).) In upholding the constitutionality of the penal statute, the California Supreme Court held that the conduct necessary to establish incitement to riot "is neither similar nor comparable to speech which merely stirs to anger, invites public dispute, or brings about a condition of unrest." (*People v. Davis* (1968) 68 Cal.2d 481, 485 [67 Cal.Rptr. 547, 439 P.2d 651].)

■ Similarly, in *Braxton v. Municipal Court* (1973) 10 Cal.3d 138, 142–143 [109 Cal.Rptr. 897, 514 P.2d 697], the Supreme Court narrowly

interpreted a statute authorizing the exclusion of persons who have " 'willfully disrupted the orderly operation' " of a college campus. To preserve its constitutionality, the court interpreted Penal Code section 626.4 "to permit exclusion from the campus only of one whose conduct or words are such as to constitute, or incite to, a substantial and material physical disruption incompatible with the peaceful functioning of the academic institution and of those upon its campus." (*Braxton*, at p. 150.) The court avoided a construction that would have permitted the exclusion of persons who caused a disruption simply through provocative speech that was offensive to the audience. (*Id.* at pp. 146–147.) On this point, the court cited *Tinker, supra*, 393 U.S. 503 and quoted *Terminiello v. Chicago* (1949) 337 U.S. 1, 4 [93 L.Ed. 1131, 69 S.Ct. 894], for the proposition that " '[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.' " (*Braxton*, at pp. 146–147; see also *In re Brown* (1973) 9 Cal.3d 612, 623 [108 Cal.Rptr. 465, 510 P.2d 1017] [statute "prohibiting disturbing the peace by tumultuous and offensive conduct must be limited to disruption of public order by acts that are themselves violent or that tend to incite others to violence"].)

██ *Olivia N. v. National Broadcasting Co.* (1981) 126 Cal.App.3d 488 [178 Cal.Rptr. 888] drew a distinction between speech that incites violence and speech that results in a copycat crime. The court held that a television broadcaster could not constitutionally be held liable on theories of negligence and recklessness for broadcasting a film allegedly causing viewers to decide to commit a similar rape. Plaintiff was required to show "incitement," which she admittedly was unable to do. (*Olivia N.*, at pp. 491, 494–495.) The court applied the test for incitement set forth in *Brandenburg v. Ohio* (1969) 395 U.S. 444, 447 [23 L.Ed.2d 430, 89 S.Ct. 1827] and concluded that "incitement" referred to speech that "advocate[s] or encourage[s] violent acts" or speech that was " 'directed to inciting or producing imminent lawless action.' " (*Olivia N.*, at pp. 491, 494–495, quoting *Brandenburg*, at p. 447.) The court emphasized that "the United States Supreme Court has 'consistently held that the fact that protected speech may be offensive to some does not justify its suppression.' " (*Olivia N.*, at p. 495, quoting *Carey v. Population Services International* (1977) 431 U.S. 678, 701 [52 L.Ed.2d 675, 97 S.Ct. 2010].)

The focus on *inciting* speech, rather than speech that may result in disruption or other harm, reflects what has come to be known as the "heckler's veto" rule: speech that seeks to communicate ideas, even in a provocative manner, may not be prohibited merely because of the disruption it may cause due to reactions by the speech's audience. (*O'Toole v. Superior Court* (2006) 140 Cal.App.4th 488, 508 [44 Cal.Rptr.3d 531].) The Supreme

Court has emphatically declared, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." (*Texas v. Johnson* (1989) 491 U.S. 397, 414 [105 L.Ed.2d 342, 109 S.Ct. 2533]; see also *Street v. New York* (1969) 394 U.S. 576, 592 [22 L.Ed.2d 572, 89 S.Ct. 1354]; *Terminiello v. Chicago, supra*, 337 U.S. at pp. 4–5.) The "heckler's veto" rule is discussed in *Tinker, supra*, 393 U.S. at pages 508–509, the Supreme Court's seminal decision on free speech in high schools. (See also *Boyd County High School v. Bd. of Educ. of Boyd* (2003) 258 F.Supp.2d 667, 689–690 [discussing *Tinker* and "heckler's veto" doctrine].) The right to free speech is constitutionally protected from "censorship by hostile reaction." (*San Diego Unified Port Dist. v. U.S. Citizens Patrol* (1998) 63 Cal.App.4th 964, 970 [74 Cal.Rptr.2d 364].)

We conclude that the plain language of section 48907 mandates that a school may not prohibit student speech simply because it presents controversial ideas and opponents of the speech are likely to cause disruption. Schools may only prohibit speech that incites disruption, either because it specifically calls for a disturbance or because the manner of expression (as opposed to the content of the ideas) is so inflammatory that the speech itself provokes the disturbance. "To many, the immediate consequence of this freedom [of speech] may often appear to be only verbal tumult, discord, and even offensive utterance. These are, however, within established limits, in truth necessary side effects of the broader enduring values which the process of open debate permits us to achieve. That the air may at times seem filled with verbal cacophony is, in this sense not a sign of weakness but of strength. We cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated." (*Cohen v. California* (1971) 403 U.S. 15, 24–25 [29 L.Ed.2d 284, 91 S.Ct. 1780].)[6]

---

[6] Although we do not rely on the legislative history of section 48907, it supports the conclusion that the Legislature intended to incorporate this understanding of "to incite" in enacting section 48907. Section 48907 "constitutes a statutory embodiment of the [*sic*] *Tinker*[, *supra*, 393 U.S. 503] and related First Amendment cases at that time" (*Lopez, supra*, 34 Cal.App.4th at p. 1318; see also *Bright, supra*, 18 Cal.3d at pp. 458, 463). The Legislature's choice of the verb "to incite" likely resulted from the frequent use of "incite" and "incitement" in the United States Supreme Court's "fighting words" cases. (See, e.g., *Cohen v. California, supra*, 403 U.S. at p. 18; *Brandenburg v. Ohio, supra*, 395 U.S. at p. 447; *Feiner v. New York* (1951) 340 U.S. 315, 321 [95 L.Ed. 295, 71 S.Ct. 303]; *Chaplinsky v. New Hampshire* (1942) 315 U.S. 568, 571–572 [86 L.Ed. 1031, 62 S.Ct. 766]; see also *Lopez*, at pp. 1317–1318 [summarizing legislative history indicating that Legislature considered constitutional case law in drafting section 48907].) These cases and their progeny are the same cases underlying the "heckler's veto" rule and the California incitement cases discussed previously.

*B.* Immigration *Is Protected Speech Under Section 48907*

Even if we assume that the disruption that followed the publication of *Immigration* constituted "substantial disruption of the orderly operation of the school" and that there was a "clear and present danger" of disruption as required by section 48907, Smith's opinion editorial could only be prohibited under section 48907 if it *incited* the disruption.

■ The editorial is a communication of ideas, the expression of a viewpoint on an emotionally debated contemporary issue. "It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." (*Street v. New York, supra*, 394 U.S. at p. 592.) *Immigration* suggests that a significant proportion of undocumented immigrants are criminals and that any person who cannot speak English should be suspected of being an undocumented immigrant. ■ Although *Immigration* communicates Smith's viewpoint in a disrespectful and unsophisticated manner, it contains no direct provocation or racial epithets. We conclude that *Immigration* was not inciting speech that the District was authorized to prohibit under section 48907. We cannot allow the reactions to *Immigration* by the reading audience (that is, the "heckler's veto") to silence Smith's communication of unpopular views. *Immigration* is protected speech.

The District contends that *Immigration* was incitement because Smith testified that his purpose in writing the opinion editorial was to get people "pissed off" and he wanted a "response . . . that would cause action." However, his express purpose is not evidence that he intended to cause substantial disruption of the school, as opposed to other action, such as enforcement of the immigration laws. *Immigration* ends with such a call to political action: "I feel like there has to be some major reforms in immigration policy. I just hope it happens before our country rots from within."

Our conclusion does not mean that the District lacked authority to teach writing and journalism standards. The statute provides schools some authority to control student speech in school newspapers. Section 48907 makes it the responsibility of student journalism advisers "to maintain professional standards of English and journalism." For example, this responsibility permits the prohibition of profanities in official school publications. (*Lopez, supra*, 34 Cal.App.4th at pp. 1323–1327.) It likely authorizes journalism advisers to restrict the publication of student writings that are ungrammatical, poorly written, or inadequately researched.

■ We need not determine the scope of the "professional standards" provision in section 48907 because we are not here confronted with circumstances in which a journalism adviser sought to improve the journalistic

quality of a student piece and the student refused the suggestions. To the contrary, Smith accepted the only prepublication suggestions made to him regarding *Immigration*, to wit, the journalism teacher's suggestion that he state where he got his facts about the requirements for citizenship and the Principal's request that he remove the word "Hell" from the opinion editorial. Although section 48907 permits schools to engage with student journalists regarding the linguistic and journalistic merits of their work, that is not what happened here.

## IV. *The District's Response Infringed Smith's Right to Free Speech*

The trial court concluded that there was no infringement of Smith's right to free speech regarding *Immigration* because the piece was published and Smith was not disciplined for writing it. The court misconstrued the scope of protection of free speech accorded by section 48907.

### A. *The Standard for Determining Infringement*

Before the enactment of section 48907, it was established that "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights." (*Laird v. Tatum* (1972) 408 U.S. 1, 11 [33 L.Ed.2d 154, 92 S.Ct. 2318]; see also *Adcock v. Board of Education* (1973) 10 Cal.3d 60, 66 [109 Cal.Rptr. 676, 513 P.2d 900].) A violation of free speech rights may be established where a governmental response to speech " 'would chill or silence a person of ordinary firmness from future First Amendment activities.' " (*Mendocino Environmental Center v. Mendocino County* (9th Cir. 1999) 192 F.3d 1283, 1300; see also *Bennett v. Hendrix* (11th Cir. 2005) 423 F.3d 1247, 1254.)

The rationale for the "person of ordinary firmness" test is set forth in *Bennett v. Hendrix, supra,* 423 F.3d at pages 1251–1252, where the court explained that "[a]n objective standard provides notice to government officials of when their retaliatory actions violate a plaintiff's First Amendment rights. In contrast, 'a subjective standard would expose public officials to liability in some cases, but not in others, for the very same conduct, depending upon the plaintiff's will to fight.' [Citation.] '[I]t would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity . . . .' [Citation.] There is no reason to 'reward' government officials for picking on unusually hardy speakers. At the same time, we recognize that government officials should not be liable when the plaintiff is unreasonably weak-willed or suffers only a *'de minimis* inconvenience to her exercise of

First Amendment rights.' [Citations.] The 'ordinary firmness' test is therefore protective of the interests of both government officials and plaintiffs alleging retaliation."

 Because the California Legislature intended to incorporate constitutional standards into section 48907 (*Lopez, supra*, 34 Cal.App.4th at p. 1318), we construe section 48907 as incorporating the same standard for determining infringement of the right to free speech applicable under the United States Constitution. That is, a governmental response that would constitute a violation of a student's free speech rights under the First Amendment would also constitute a violation of a student's right to exercise freedom of speech under section 48907.

### B. The District Responses to Immigration

#### 1. The District's Effort to Facilitate Responsive Speech

The District facilitated the protesting students' response to *Immigration* by holding an assembly the morning after the newspaper came out. At that meeting, parents and the students who had left their classes were able to express their reactions to *Immigration*, both orally and in writing. A similar meeting was held at the school the evening of November 15. Plaintiffs contend that by providing a forum for expression of the protestors' viewpoint the District facilitated a "heckler's veto" and infringed Smith's right to free speech. Plaintiffs further contend that on November 14 the District should have disciplined the students who left class and enforced rules limiting parental access to campus.

We disagree. The District did not infringe Smith's right to free speech by holding meetings that provided an opportunity for the protestors to express their reactions to *Immigration*. It is quite the opposite. By enabling the protestors to respond to offensive speech with their viewpoint, the District modeled the civil discourse education should foster. " 'The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.' [Citation.] It is the classroom and academic institutions which are the marketplace of ideas and where the exchange of ideas and arguments are to be fostered, not curtailed." (*Adcock v. Board of Education, supra*, 10 Cal.3d at p. 67; see also *Tinker, supra*, 393 U.S. at p. 512.)

 None of the cases cited by plaintiffs support the proposition that a school infringes on a student's right to free speech merely by facilitating a peaceful avenue for self-expression by persons upset by the student's speech. We decline to adopt a rule contrary to our nation's traditions of open debate.

## 2. *The District Did Not Discipline Smith*

It is undisputed that Smith was never suspended or formally disciplined for authoring *Immigration.* Plaintiffs contend that the District November 14 letter constituted discipline because it publicly conveyed the District's disagreement with *Immigration* and chastised Smith for writing it. It did neither.

A school response expressing strong disapproval of the content of a student's speech may in some circumstances amount to censure of the student and thereby constitute infringement of free speech. (See *Holloman ex rel. Holloman v. Harland* (11th Cir. 2004) 370 F.3d 1252, 1268–1269 (*Holloman*).) In *Holloman*, the plaintiff refused to say the Pledge of Allegiance and his teacher singled him out in front of his entire class, "subjecting him to embarrassment and humiliation." (*Id.* at p. 1269.)

In contrast, the District letter disavowing Smith's viewpoint did not constitute censure. The District was in the difficult position of balancing Smith's free speech rights with the need to foster an educational environment of respect for all students. There is no evidence that the District engaged in the type of in-class singling out involved in *Holloman, supra,* 370 F.3d 1252. Although it was undoubtedly clear that the November 14 letter referred to *Immigration,* the District's decision not to use Smith's name depersonalized the issue.

A speaker who chooses to speak in a provocative manner cannot complain of infringement simply because some degree of attention is directed toward him. In the letter, the District acknowledged the understandable distress experienced by the Latino students and parents and expressed its "deepest regrets for the hurt and anger" generated by *Immigration.* Some degree of negative inference about *Immigration* was inevitable in that context, but the District's letter does not directly criticize Smith. None of plaintiffs' cases support a conclusion that the District's response constituted censure.

We conclude the District's efforts to give the protestors a forum, to acknowledge the legitimacy of their reactions, and to distance itself from Smith's viewpoint was not a censure or discipline of Smith.[7]

---

[7] Because there was no disciplinary sanction, there was no violation of section 48950. (See *Lopez, supra,* 34 Cal.App.4th at p. 1330.)

### 3. *The District Did Violate Section 48907 by Announcing That Immigration Is Not Protected Speech*

Unfortunately, the District response included announcing that the District should never have published *Immigration* and ordering that remaining copies of The Buzz be retracted. In so doing, the District violated section 48907.

In its November 14, 2001 letter, the District stated that *Immigration* "should not have been printed" because it violated the District's policy regarding student publications and the District's "Human Relations and Respect Mission Statement." The letter quoted a portion of the District's speech policy that states "Students' rights of expression shall be limited only as allowed . . . by law in order to maintain an orderly school environment and to protect the rights, health, and safety of all members of the school community." The letter also quoted a portion of the District's Mission Statement stating that "all individuals, including students, staff, parents and community members shall be treated with dignity, respect and fairness." The clear message of the letter was that *Immigration* was outside the scope of Smith's "rights of expression" and that future speech similar to *Immigration* would not be tolerated.

The message of the November 14 letter was reinforced when the teachers reviewed the speech policy and mission statement in class, and again at the December 4 public District Board of Trustees meeting when the Principal stated that *Immigration* could have been prohibited in order to "maintain an orderly school environment and to protect the rights, health, and safety of all members of the school community." She further emphasized the point in stating that she had "retracted the remaining copies of the paper" including *Immigration*.

 The District speech policy, at least as construed in the November 14 letter, constitutes regulatory government action that may result in an actionable chill, and the threat of censorship implicit in the letter is a legally cognizable harm. (*O'Keefe v. Van Boening* (9th Cir. 1996) 82 F.3d 322, 325.) At a minimum, the District's response had the effect of chilling any further dissemination of the protected message in *Immigration*. "[T]he right to free speech protects not only the content but the dissemination and circulation of the material as well." (*Bright, supra,* 18 Cal.3d at p. 466.) Although the record is ambiguous as to whether copies of the paper were actually retracted, it is clear that as of November 14 there were no more copies of The Buzz containing *Immigration* available on campus. If Smith wanted to continue to express the ideas in *Immigration* he needed to copy and disseminate the opinion editorial on his own. To do so would have amounted to open defiance of the Principal and Superintendent. At the very least the District's actions

threatened that any future efforts to distribute *Immigration* would be censored. (Cf. *Sypniewski v. Warren Hills Regional Bd. of Educ.* (3d Cir. 2002) 307 F.3d 243, 251–252 [considering motion for preliminary injunction to prevent enforcement of racial harassment policy to prohibit wearing of shirt where, after shirt was allowed to be worn, school district indicated that " 'in hindsight' " shirt should have been prohibited].)

We reject any suggestion that the District's response was merely a " '*de minimis* inconvenience' " to Smith's exercise of his free speech rights. (*Bennett v. Hendrix, supra,* 423 F.3d at p. 1252.) That phrase refers to government responses to protected speech that are so insignificant that they cannot be viewed as adequate to chill or silence a person of ordinary firmness. (*Bart v. Telford* (7th Cir. 1982) 677 F.2d 622, 625 [noting, for example, that an action cannot be based on allegations that an authority figure frowned at the plaintiff in response to the speech activity].) We conclude that the District's response to *Immigration* would have a significant impact on a person of ordinary firmness. The November 14 letter and subsequent actions constituted an official interpretation of the District's speech policy and communicated to Smith that *Immigration* was not within his "rights to expression" on campus. In doing so, the District inaccurately represented the scope of Smith's right to free speech. The letter was handed out to the entire student body and it was signed by the Principal and Superintendent, who are authority figures with substantial discretionary powers and whose words "carry a presumption of legitimacy." (*Holloman, supra,* 370 F.3d at p. 1269.)

Such an advisory opinion can constitute the suppression of free speech. For example, in *Bantam Books, Inc. v. Sullivan* (1963) 372 U.S. 58, 61, 66–67 [9 L.Ed.2d 584, 83 S.Ct. 631], the United States Supreme Court concluded that letters from a state commission on morality advising book distributors that the commission's members considered certain books objectionable for sale to youths constituted "informal censorship" in violation of the First Amendment even though the books were not banned and the commission lacked authority to apply legal sanctions. The court concluded that the practice amounted to a "system of prior administrative restraints, since the Commission is not a judicial body and its decisions to list particular publications as objectionable do not follow judicial determinations that such publications may lawfully be banned." (*Bantam,* at p. 70.)

In considering the legal effect of the District's response, we must keep in mind that the hypothetical "person of ordinary firmness" or resolve is a teenager, still developing self-confidence and intellectual independence, still subject to peer pressure and more likely to be intimidated by authority. (See *Bennett v. Hendrix, supra,* 423 F.3d at p. 1252 [noting that the analysis " 'focuses on the status of the speaker, the status of the retaliator, the

relationship between the speaker and the retaliator, and the nature of the retaliatory acts' "].) For these reasons, on the whole, high school students are more likely to be chilled by a school's display of authority. A person of ordinary firmness would have been chilled from openly defying the Principal and Superintendent by repeating on campus the views expressed in *Immigration*. That suppression of Smith's viewpoint is sufficient to establish infringement in this case. (See *Bart v. Telford, supra*, 677 F.2d at p. 625 [the effect on freedom of speech "need not be great in order to be actionable"].)

 To conclude otherwise would permit a school to suppress future protected speech by characterizing past speech as unprotected, as long as the school did not actually censor the past speech. The effect would be to limit students' right to free speech on controversial topics to a one-time event, or at least to suppress the controversial speech until a particularly stubborn and persistent speaker (like Smith when he submitted *Reverse Racism*) comes along to test the school's resolve, or until the passage of enough time to diminish the power of the school's admonition. The right of free speech is not subject to such manipulation and diminishment. "Disharmony and friction are the healthy but natural results of a society which cherishes the right to speak freely on a subject and these resultant by-products should never prevent an individual from speaking or cause that individual to be penalized for such speech. Any attempt to do so abrogates the protections that the First Amendment affords to all." (*Adcock v. Board of Education, supra*, 10 Cal.3d at p. 68.)

### 4. Conclusion

The District's response to the tumult caused by *Immigration* was essentially twofold. The District attempted to ease the distress of the protestors by distancing itself from Smith's opinion editorial and by providing the protestors opportunities to express their views on *Immigration*. This was wholly consistent with free speech values and it is likely that, viewed as a whole, the publication of *Immigration* resulted in a useful exchange regarding how different persons and communities might view the sensitive topic of illegal immigration. (See *Tinker, supra*, 393 U.S. at p. 512; *Bright, supra*, 18 Cal.3d at p. 456.) Even if Smith or the most belligerent protestors learned little from the process, it is likely that the school community gained understanding of the issues. For example, following publication of *Immigration* some students formed a group called Todos Unidos (Everyone United), in order "to help our students understand the meaning of different cultures."[8]

---

[8] Similarly, the first public speaker at the District's December 4 Board of Trustees meeting stated, "I want to start by acknowledging the pain, the harm, the discomfort, that came as a result of the article that was published in Buzz. I love what happened as a result. [¶] I love that the community has come together. There's been open dialogue. There are programs for the

On the other hand, the District sent the clear message that no further speech similar to *Immigration* would be tolerated. In the aftermath of *Immigration* the District succumbed to the fear of disruption and discontent. While understandable, this was not permissible. "[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, *Terminiello* v. *Chicago*[, *supra*, 337 U.S. 1]; and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society." (*Tinker*, *supra*, 393 U.S. at pp. 508–509; see also *Bright*, *supra*, 18 Cal.3d at p. 456.) It is particularly troubling that the Superintendent issued the order to retract copies of The Buzz before he even read the opinion editorial. When faced with offensive student speech, school districts must proceed cautiously with due regard to the valuable rights at stake, rather than reacting impulsively because of protest about the speech.

 It is to the District's credit that it resisted the temptation to censor Smith's second, similarly provocative opinion editorial, *Reverse Racism*, which was published about six months later, in May 2002. Nevertheless, we are bound to conclude that the District's response to *Immigration* infringed on Smith's right to exercise freedom of speech and violated section 48907. (See *Ketchens v. Reiner* (1987) 194 Cal.App.3d 470, 480 [239 Cal.Rptr. 549], quoting *Elrod v. Burns* (1976) 427 U.S. 347, 373 [49 L.Ed.2d 547, 96 S.Ct. 2673] [" 'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury' "].)

V.–VII.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

future that the students are involved, that the students are part of the exchange of ideas and the solutions to the long-term problems, which are lack of dignity and respect for every single member of their community." A parent at the meeting stated, "I would like to thank Andrew Smith for writing that article because he does have the freedom of speech, but he brought us [immigrants] together very close. [¶] We're now united like we should be from the get-go. I'm sorry it took this to get us where we're at now, but thank you, Andrew."

*See footnote, *ante*, page 1439.

## DISPOSITION

The trial court judgment is reversed and remanded for proceedings consistent with this decision.

Simons, Acting P. J., and Needham, J., concurred.

A petition for a rehearing was denied June 20, 2007, and respondents' petition for review by the Supreme Court was denied September 12, 2007, S154067.